UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,                    CRIMINAL NO. 17-135 (ADM/DTS)

        Plaintiff,

v.                                          <u>REPORT AND RECOMMENDATION</u>

1)    RODOLFO ANGUIANO, JR. and

2)    KELVIN BAEZ,
       *a/k/a Taliban,*

        Defendants.

---

David P. Steinkamp, Assistant U.S. Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota, for Plaintiff;

John J. Leunig, The Law Office of John J. Leunig, 7900 Xerxes Avenue South, Suite 815, Minneapolis, Minnesota, for Defendant Rodolfo Anguiano, Jr.; and

Patrick G. Leach, Leach Law Office, 6465 Wayzata Boulevard, St. Louis Park, Minnesota, for Defendant Kelvin Baez

---

### FINDINGS OF FACT

On May 5, 2017, while patrolling in Bloomington, Minnesota, Officer Jacob Gruber spotted a red Volkswagen Jetta with California license plates enter the Days Inn parking lot. Tr. at 33-34, 36-38. Officer Gruber, who regularly patrolled the "high-crime area" surrounding the Days Inn, had seen the same car at the motel approximately a week earlier. Tr. at 38. At that time, Officer Gruber noted the Volkswagen's tabs were expired and its registered owner, Elizabeth Sanchez, was not registered at the motel. He did not investigate further at that time. *Id.*

Nonetheless, when the Volkswagen exited the Days Inn parking lot on May 5, Officer Gruber followed. Tr. at 41-42. He confirmed its registration was still expired. [1] *Id.* Officer Gruber suspected the driver was involved in drug activity because the car had California plates and because it's registered owner was not registered at the Days Inn. Tr. at 43-44, 54. When the Volkswagen crossed the middle yellow line, Officer Gruber pulled the car over. Tr. at 43, 152.

Officer Gruber approached the car; he discovered its sole occupant was Defendant Rodolfo Anguiano, Jr. ("Anguiano"). Tr. at 45. Officer Gruber noticed an "overwhelming" air freshener smell emanating from dryer sheets covering the car's floor. Tr. at 46. Because dryer sheets may mask the odor of narcotics and confuse drug-sniffing dogs, Officer Gruber viewed them as further indication of possible drug activity. Tr. at 47-48. Officer Gruber learned Anguiano lacked proof of insurance and was unable to identify the car's previous owner. Tr. at 49-50.

Officer Gruber then asked Anguiano to get out of the car to continue their conversation. Tr. at 50. Anguiano said he was in town for three days to attend a wedding but could not describe the wedding's location. The story also contradicted Officer Gruber's recollection of the car's earlier presence at the Days Inn. *Id.* Officer Gruber's suspicion was not allayed when Anguiano explained he had flown to Minnesota while his cousin had driven the car out from California. Tr. at 51-52. Officer

---

[1]    While the vehicle's registration had expired nearly two months prior to the incident, the sticker on the plate indicated the registration was current. Tr. at 40. Officer Gruber determined the registration was outdated by running a computer check of the registration. *Id.* Officer Gruber said the discrepancy was "common," and resulted either from stolen stickers or delays in updating the computer database. Tr. at 39-40. However, by May 5 when he checked the registration a second time, he discounted the latter explanation because there had been "plenty of time for the computer systems to catch up." Tr. at 90.

Gruber had been trained that drug smugglers often have third parties drive their vehicle to a location before personally retrieving their car.  *Id.*

Officer Gruber asked Anguiano whether he had ever been arrested.  Tr. at 53. He initially replied that he had "never been in trouble for drugs before."  *Id.*  A criminal background check revealed Anguiano had been previously arrested, though never convicted, for drug crimes.  Tr. at 53.  Given his suspicion that drug activity was afoot, Officer Gruber sought Anguiano's consent to search the Volkswagen.  Tr. at 54. Anguiano refused.  *Id.*  As the conversation coalesced around drugs, Officer Gruber testified Anguiano became increasingly tense and nerve-wracked.  *Id.*  Officer Gruber called a drug-sniffing dog to examine the car.  *Id.*

The dog arrived five to ten minutes later.  Tr. at 55.  By then Anguiano had been patted down for officer safety but had not been handcuffed or arrested.  *Id.*  The dog sniffed for 2-3 minutes but never alerted for drugs despite showing interest in the car's undercarriage.  *Id.*  Officer Gruber returned to his squad car to discuss with another officer how to proceed:

| | |
|---|---|
| Officer Gruber: | Christ, Brian.  … It's hard to believe. I don't think I've ever had such good shit. |
| Officer 2: | It's a pretty good suspicion on that one. |
| Officer Gruber: | I don't know. Maybe he's doing something else. |
| Officer 2: | Could be. |
| Officer Gruber: | Smuggling people. |
| Officer 2: | You never know. |
| Officer Gruber: | Fuck. |

Officer 2:                It's the nature of the game though. You can't get them all.

Officer Gruber:        It sucks to let it go.

[Ex. 1, 19:52:21-19:52:47].

Officer Gruber returned to Anguiano's car, handed him his driver's license and said "no ticket or anything for you." Tr. at 58; Ex. 1, 19:53:00-19:53:25. As Anguiano opened his wallet, Officer Gruber noticed what appeared to be a United States Drug Enforcement Agency ("DEA") badge and "more than ten" plastic cards, presumably credit cards. Tr. at 58-59. He asked Anguiano "What's that badge?" to which Anguiano initially replied "nothing," but within 18 seconds of Officer Gruber's original question Anguiano presented the badge and explained he had purchased it on eBay as a Halloween prop. Tr. at 61-62; Ex. 1, 19:53:08-19:54:26. Anguiano never presented himself to Officer Gruber as a DEA agent. *Id.*

Despite Officer Gruber's earlier promises to let Anguiano go, Officer Gruber ordered Anguiano to "hang out here for a minute," returned to his squad car, and called his supervisor Sergeant Cardenas. Ex. 1, 19:54:16-19:55:21. Before calling Sergeant Cardenas, Officer Gruber muted the squad car's audio recorder. He never turned the audio back on. Tr. at 92. Officer Gruber testified that after calling Sergeant Cardenas he decided he would arrest Anguiano; Sergeant Cardenas testified he told Officer Gruber to wait at the scene until he arrived. Tr. at 63-64. While waiting for Sergeant Cardenas, Officer Gruber and another officer conversed with Anguiano. Ex. 1, 19:56:22-20:02:52. The video, with its audio muted, depicts Anguiano opening the car doors and trunk as if to allow the officers to search his car, which they never did. *Id.*

4

While on route to the scene, Sergeant Cardenas confirmed that Anguiano was not a DEA agent and learned of Anguiano's prior drug smuggling arrests and frequent U.S. – Mexico border crossings.  Tr. at 208-09.  When Sergeant Cardenas arrived, he spoke briefly in private with Officer Gruber.  *Id.*  Sergeant Cardenas then quickly spoke with Anguiano before placing him under arrest.  Ex. 1, 20:07:57-20:08:12.

The testimony regarding Anguiano's arrest is inconsistent in several important respects.  Officer Gruber testified that after he spoke with Sergeant Cardenas he was going to arrest Anguiano; Sergeant Cardenas testified he told Officer Gruber not to let Anguiano go but to await his arrival.  Tr. at 63-64, 318. Officer Gruber initially testified he arrested Anguiano for identity theft, but later stated Anguiano was arrested for both identity theft and obstructing legal process.  Tr. at 63, 115-16.  The identity theft arrest was allegedly predicated on Anguiano's possession of numerous credit cards in other peoples' names, but Officer Gruber acknowledged he did not know whether the plastic cards were credit cards until *after* Anguiano's arrest.  Tr. at 115-16,198.

Sergeant Cardenas testified that he arrested Anguiano for obstructing legal process because Officer Gruber had told him Anguiano initially refused his request to examine the fake DEA badge. Tr. at 276-77.  Officer Gruber admitted Anguiano did present the badge after a momentary delay, before then showing Officer Gruber how easily they could be found on eBay. Tr. at 62; Ex. 1, 19:53:21-19:53:21:26. Anguiano was not arrested for impersonating a DEA agent (because he never claimed to be one) and mere possession of the fake badge is not a crime.  Tr. at 109, 116.  In any event, the obstructing legal process arrest occurred at least 15 minutes after Anguiano allegedly refused – then presented – the badge for Officer Gruber's inspection. Ex. 1,

19:53:05-20:08:12. Ultimately, Anguiano was never charged with either obstructing legal process or identity theft.

After the arrest, Anguiano's Volkswagen was thoroughly searched. Tr. at 64. Inside, officers discovered a satchel containing two additional law enforcement badges and $4,000 in cash, and revealed that compartments in the car easily detached, suggesting they could be used for concealment of contraband. Tr. at 64-65. No drugs or other contraband were found. Tr. at 65, 114-15.

After impounding Anguiano's car, Officer Gruber drove to the Embassy Suites.[2] Tr. at 67-68. He visited the front desk and confirmed Anguiano was registered to Room 714 but the Volkswagen's registered owner, Elizabeth Sanchez, was not registered at the hotel. Tr. at 67, 87-88.

Officer Gruber, Sergeant Cardenas, and Officer Danner went to the room and knocked on the door. *Id.* A woman, later identified as Defendant Gavino, answered. Tr. at 69-70. Sergeant Cardenas asked whether the officers could come in to talk to her about a "matter." Tr. at 70, 283-84. Gavino opened the door wider and gestured the officers into the room, but never verbally assented. *Id.*

Immediately inside was a large living room area with chairs and a pull-out couch. Down the hall there was a separate bedroom with a door. Tr. at 71, 76. Defendant Baez was sitting on the couch in the front area. Tr. at 71. Officer Gruber's initial room scan located a methamphetamine pipe on the end table, and luggage and personal belongings in the living room. Tr. at 72-73. Gavino said they had been staying at the hotel for a couple of days visiting a friend. Tr. at 75.

---

[2]    During their initial conversation Anguiano had told Officer Gruber he had changed hotels and was now staying at the Embassy Suites West. Tr. at 51.

Officer Gruber testified that he asked and received Gavino's permission to search her belongings.[3] Tr. at 75. In the same conversation, he testified, she consented to a search of the room. Tr. at 75-76, 305. Sergeant Cardenas did not recall Officer Gruber ask for consent to search the room; rather he heard Officer Gruber ask "if there were items in the room that belonged to her or Mr. Baez," to which Gavino responded by pointing to 2-3 bags in the living room and consenting to their search.[4] Tr. at 287, 333. Sergeant Cardenas speculated that the supposed conversation in which Gavino consented to a room search must have occurred after he left the room. Tr. at 75, 333.

Officer Gruber searched the entire suite. Tr. at 76-79. In the back bedroom, he saw an armoire secured with a rigid chain lock that was apparently being monitored by a cell phone camera. *Id.* Officer Gruber asked, if there were drugs in the room, where would they be; Baez allegedly responded "Well, in the armoire obviously." Tr. at 79.

Officer Gruber called in a drug-sniffing dog, who alerted to drugs in the back bedroom. Tr. at 189. Officer Gruber then removed a panel from the sink's cabinet in the back bedroom and discovered several pounds of suspected methamphetamine. After discovering the methamphetamine, the police "froze" the room and obtained a warrant to search the room and the Equinox. Tr. at 82-84. Both Officer Gruber and Sergeant Cardenas testified that, without discovery of these drugs, they lacked probable cause for a search warrant. Tr. at 136, 324-25. Pursuant to the warrant, the search of the Equinox produced methamphetamine, marijuana, and a gun; the search of the locked armoire produced methamphetamine and a gun. Tr. at 84.

---

[3]     Gavino did not sign a consent to search form. Tr. at 186.

[4]     In Gavino's luggage, Officer Gruber found car keys, a Chevy Equinox owner's manual, and some .22 caliber bullets, but no contraband. Tr. at 78.

Baez and Gavino were arrested. Tr. at 189-90.  That evening, Anguiano, Baez and Gavino were interviewed separately at the jail.  Tr. at 221.  Anguiano, Baez and Gavino were indicted for Conspiracy to Distribute Methamphetamine and Possession With Intent to Distribute Methamphetamine [Docket No. 28]. Anguiano moved to suppress all evidence [Docket No. 67], and Baez moved to suppress all evidence and statements [Docket Nos. 41, 51, 53].[5]

## CONCLUSIONS OF LAW

### I.    The Initial Traffic Stop

Police officers may initiate a traffic stop when they have a reasonable suspicion based on articulable facts and rational inferences that the person has committed or is about to commit a crime.  *Terry v. Ohio*, 392 U.S. 1, 21 (1968).  Courts analyze the propriety of the *Terry* stop in light of the totality of the circumstances involved. *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008).  It is indisputable that the initial stop itself was constitutional.  Anguiano was driving with an expired registration and committed a lane violation.  Tr. at 39, 43; Ex. 1 19:24:18-19:24:26; Ex. 3.  Officer Gruber had seen Anguiano's car a week earlier at a motel known for drug trafficking.  It had California license plates; it was registered to a woman who did not share Anguiano's name and who was not a registered guest at the motel adjacent to the car.

But, Anguiano argues, because this stop lasted more than 40 minutes before he was arrested, which is "beyond the time reasonably required to complete th[e] mission of issuing a warning ticket," the initial traffic stop was prolonged in violation of the Fourth Amendment's protection against unreasonable seizures.  [Docket No. 118 at 10, 15].

---

[5]    On September 26, 2017, Defendant Gavino withdrew her motions and pled guilty to Use of a Communication Device to Facilitate a Felony Drug Crime.  [Docket No. 127].

[Docket No. 118 at 13]; *Rodriguez v. United States*, ___ U.S. ___ (2015)(quotations omitted)(holding that absent reasonable suspicion, a police officer cannot extend a routine traffic stop to conduct a drug-sniffing dog search).  Anguiano argues Officer Gruber lacked reasonable articulable suspicion to prolong the search beyond the time necessary to investigate the traffic infractions. [Docket No. 118 at 18].

Though the authority for a vehicular *Terry* stop ends when tasks tied to the traffic infraction are completed, if during the course of that traffic stop, "an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has 'justification for a greater intrusion unrelated to the traffic offense.'"  *United States v. Bloomfield*, 40 F.3d 910, 918 (8th Cir. 1994)(quoting *United States v. Cummings,* 920 F.2d 498, 502 (8th Cir. 1990)).

Officer Gruber had reasonable articulable suspicion to prolong his detention based on what he learned during the stop.  Anguiano's explanation for why he and his vehicle were in Minnesota was dubious. Tr. at 52. The presence of copious dryer sheets on the floor of the car indicated potential drug activity.  Anguiano had previously been arrested on suspicion of committing drug crimes.  Given this information, Officer Gruber was justified in extending his initial stop to investigate whether drug activity was afoot.  His discovery of the fake DEA badge and the plastic cards justified further inquiry.  Like peeling the layers of an onion, many of the suspicious circumstances arose sequentially over the course of time during the traffic stop.  Even if no one factor had risen to the level of reasonable suspicion, as they unfolded and taken together, the facts he learned were sufficient articulable basis to justify Officer Gruber in prolonging his investigation.

*Rodriguez* does not suggest otherwise.  In *Rodriguez*, a police officer stopped a vehicle after it briefly veered onto the shoulder.  *Rodriguez*, ___ U.S. ___ , 135 S. Ct. at 1612.  After the officer issued a verbal warning and returned the occupants' documents, the officer requested – based on no articulable facts to suggest the vehicle contained drugs – to conduct a drug-sniffing dog search.  When the occupants refused, the officer ordered them from the car and conducted the dog-sniff search.  The dog alerted for drugs, which were subsequently found in the vehicle.   In *Rodriguez*, the officer's prolonging of the search through a dog-sniff was an unreasonable seizure.  *Id.* at 1623.  Here, in contrast, when Officer Gruber returned Anguiano's documents, his discovery of the DEA badge and the suspected phony credit cards "generated the necessary reasonable suspicion to justify a further detention."  *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995).  The totality of the circumstances warranted further investigation.  Officer Gruber's suspicions, based on articulable facts developed over the course of the stop, allowed him to prolong his investigation without violating the Fourth Amendment.

## II.   Anguiano's Arrest

Anguiano's arrest, however, was unlawful because Sergeant Cardenas lacked probable cause.  A law enforcement officer has probable cause "to make a warrantless arrest when the totality of the circumstances at the time of the arrest 'are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'"  *Borgman v. Kedley*, 646 F.3d 518, 523 (9th Cir. 2011) (quoting *Fisher v. Wal-Mart Stores, Inc., et al.,* 619 F.3d 811, 816 (9th Cir. 2010).  Officer Gruber admitted Anguiano's traffic violation and expired tabs were not arrestable offenses.  Tr. at 95.  Despite the dog-sniff search, no drugs were found on Anguiano or in the car.  Tr. at 116,

127. Following the dog-sniff, Officer Gruber determined he lacked probable cause to arrest Anguiano and decided to let him go. Tr. at 127. Officer Gruber's disappointment was evident:

| | |
|---|---|
| Officer Gruber: | Christ, Brian. . . . It's hard to believe. I don't think I've ever had such good shit. |
| Officer 2: | It's a pretty good suspicion on that one. |
| | … |
| Officer Gruber: | Fuck. |
| Officer 2: | It's the nature of the game though. You can't get them all. |
| Officer Gruber: | It sucks to let it go. |

[Exhibit 2, p. 27-28].

What is revealing about this exchange is the officers' agreement there was no probable cause for an arrest and Officer Gruber's disappointment, which suggests he was seeking to find a justification – any justification – to make an arrest.

What occurred after Officer Gruber returned to the car and said "no ticket for you" did not establish – alone or in combination with any other known facts – probable cause for Anguiano's arrest. Anguiano's possession of the fake badge was not a crime because he never presented himself as a DEA agent.   Tr. at 109, 116. Nor is Anguiano's possession of the badge sufficient to support the Government's post facto argument that the badge, in combination with Officer's Gruber's other suspicions, established probable cause that Anguiano had committed a drug crime, as no drugs were found and the other facts were merely suspicion.   Additionally, though not

dispositive, that Anguiano was not arrested for a drug offense is some indication that the officers lacked probable cause to arrest for drugs.

Moreover, the offenses cited as the basis for Anguiano's arrest were also deficient.  Officer Gruber lacked probable cause to arrest Anguiano for identity theft, for Officer Gruber never saw the cards – indeed, he did not even know whether they were credit cards, much less whether they were in someone else's name – until after Anguiano's arrest. Tr. at 198. Nor did he refer to credit cards when consulting with Sergeant Cardenas on whether to arrest Anguiano.  Tr. at 275.  Quite simply, the presence of several plastic cards in Anguiano's wallet did not establish probable cause that Anguiano had committed or was committing any crime.

Nor was there probable cause to arrest Anguiano for obstructing legal process. Obstructing legal process occurs when one "obstructs, resists or interferes with a peace officer while the officer is engaged in the performance of official duties."  Minn. Stat. § 609.50, subd. 1(2).  To obstruct legal process, "a person must substantially frustrate or hinder the officer in the performance of her duties; mere interruption is not enough."  *State v. White*, No. A11-0698, 2012 WL 6097115 at *1 (Minn. Ct. App. Dec. 10, 2012).  There is no evidence that Anguiano "obstruction" extended beyond a mere interruption.  Officer Gruber claims Anguiano initially refused a lawful command to hand over the fake DEA badge.  That refusal is not corroborated by the dashcam video. More importantly, Anguiano did present the badge, just not as quickly as Officer Gruber had demanded. Ex. 1, 19:53:20-19:53:26. Here the dashcam video establishes that Anguiano presented the badge within 18 seconds of being asked "what's that badge" and within 6 seconds of Officer Gruber's request to view it. Ex. 1, 19:53:08-19:53:26.

Such momentary hesitation is not legally sufficient to constitute obstructing legal process. *See, State v. Richmond*, 602 N.W.2d 647, 653, rev. den. Jan. 18, 2000 (Minn. Ct. App. 1999) (defendant's conduct in failing to answer police officer's questions following a traffic stop, in failing to immediately produce his driver's license, and in twice removing his hands from the squad car after having been ordered to place them there, did not constitute obstructing legal process). Following Anguiano's supposed obstruction, he apparently offered officers to search his car, furthering the investigation rather than obstructing it. Moreover, Sergeant Cardenas, who arrested Anguiano, did not observe the alleged obstruction which occurred outside his presence and quite some time before his arrest. Based on the evidence, the officers lacked probable cause to arrest Anguiano on that charge or any other.

The record in this case suggests that both justification offered for the arrest – identity theft and obstructing legal process – were mere pretexts to justify the officers' desire to search Anguiano's car. Their testimony regarding the basis for the arrest was inconsistent. Officer Gruber initially testified he arrested Anguiano for financial transaction fraud; he later testified that Anguiano was arrested for "both" suspected credit card fraud and obstructing legal process," while Sergeant Cardenas testified Anguiano was arrested solely for obstructing legal process. Tr. at 115-16, 276-77. Officer Gruber's palpable frustration at having to let Anguiano go is also suggestive. Moreover, though Officer Gruber turned off the audio, the video of the arrest appears to depict Anguiano *cooperating*, not obstructing, legal process at the moment of his arrest. Sergeant Cardenas speaks with Anguiano only briefly before he spins him around and handcuffed him.

13

Because the officers lacked probable cause to arrest Anguiano, the evidence resulting from that arrest – Anguiano's statements and the evidence seized in the car search, must be suppressed.  However, because the Government has now raised an argument relating to the search of Anguiano's car that is not disposed of by the ruling on Anguiano's arrest, that issued is discussed below.

## III.  The Search of Anguiano's Car

After Anguiano's arrest, the officers conducted an inventory search of the car. Because Anguiano's arrest violated the Fourth Amendment, the search of his car was neither a proper inventory search nor incident to a lawful arrest. *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011). Therefore, the evidence obtained from that warrantless search must be suppressed unless another exception to the warrant requirement applies.

The Government argues the search was proper under the "motor vehicle exception," which "authorizes officers to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity." *United States v. Hill*, 386 F.3d 855, 858 (9th Cir. 2004).  The Government, who bears the burden of establishing the exception applies, has not done so. *Id.*

While the officers had reasonable suspicion that Anguiano was engaged in criminal activity, the reasons for their suspicion, even when taken together, do not establish probable cause to conduct a warrantless search of the car.  Anguiano had innocent, even if unlikely, explanations for his suspicious activities.  The Government cites *United States v. Ameling,* 328 F.3d 443 (8th Cir. 2003), to argue officers may rely on their training and experience to reject innocent explanations.  But in *Ameling*, unlike

14

here, the officers also relied on their direct observations of the defendants' conduct about which the defendants not only lied, but gave contradictory answers, to support their rejection of innocent explanations. *Id.* at 448-49.

Here, the officers lacked compelling evidence. They found no drugs or drug paraphernalia; the drug-sniffing dog did not alert. Officer Gruber testified the car's interior smelled of gasoline, which could indicate the dryer sheets were being used to mask that smell. Tr. at 96. Prior to the discovery of the badge, Officer Gruber did not arrest Anguiano and respected Anguiano's refusal to allow a search of his car because he believed he lacked probable cause. The discovery of the badge was insufficient to establish probable cause even in light of the other evidence. It is conceivable Anguiano possessed the DEA badge for innocent purposes. Though not in itself dispositive, it is telling that the officers themselves believed they had no probable cause to search the car absent a lawful arrest.[6] The evidence obtained during the search of the car – the removable panel, the cash and the fake badges – must be suppressed as fruit of the poisonous tree. *See United States v. Kelly*, 547 F.2d 82, 85 (8th Cir. 1977).

---

[6]    The Government argues that, even if the officers lacked probable cause to search Anguiano's car, the evidence within the vehicle would have "inevitably" been discovered during the impound's inventory search. However, if Anguiano had not been arrested, his car would not have been impounded. Because Anguiano's arrest was improper, any evidence that would have been seized at the impound would be invalidated as "fruit of the poisonous tree." *United States v. Billups*, 442 F. Supp. 2d 697, 710 (D. Minn. 2006). Therefore, the evidence would not have been inevitably discovered, and all evidence seized in the vehicle must be suppressed.

## IV.    <u>The Hotel Room Search</u>[7]

The officers' "knock and talk" in Anguiano's hotel room became unlawful when it extended to a search of the back bedroom.  The "search of property, without warrant and without probable cause, but with proper consent voluntarily given, is valid under the Fourth Amendment."  *United States v. Matlock*, 415 U.S. 164, 165-66 (1974).  To receive proper consent, however, the officers must establish that the person providing consent has either actual or apparent authority to give it. *Id.* Moreover, the scope of the search is limited by the scope of consent. *See United States v. Martel-Martines*, 988 F.2d 855, 858 (8th Cir. 1993)("A consensual search may not exceed the scope of the consent given."). While the Government argues under *U.S. v. Chavez Loya*, 528 F.3d 546, 552 (8th Cir. 2008), that mutual use or control of property is sufficient to

---

[7]    Sergeant Cardenas testified that even if Anguiano had not been arrested, they "absolutely" would have continued investigating at the Embassy Suites.  Tr. at 339. Officer Gruber testified he regularly conducts investigations at hotels.  Tr. at 87.  The Court is skeptical that had the officers not arrested Anguiano they would have followed him to the Embassy Suites (where he was headed when he was stopped) and reinitiated contact there.  If they had done so, it is highly likely Anguiano would have refused consent to enter or search his hotel room, which would have ended the matter.

However, the "fruit of the poisonous tree" does not extend to evidence that is "sufficiently distinguishable to be purged of the primary taint."  *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).  While the officers' inconsistencies limit their credibility that they would have visited the Embassy Suites absent Anguiano's arrest, they would have been permitted to do so.  And though the officers, by their own admission, lacked sufficient evidence to obtain a warrant to search the hotel room, they were not precluded from conducting a "knock and talk."  Because the officers' knowledge of Anguiano's stay at the Embassy Suites was discovered prior to Anguiano's improper arrest, and because they were not legally forbidden from continuing their investigation, evidence collected at the Embassy Suites is not suppressed due to the impropriety of Anguiano's arrest.  While the results of the hotel room search may thus be fruit of the poisonous tree (*i.e.* the unlawful arrest), given the officers' testimony, the Court will analyze the hotel room search on its own terms. Given the disappointing results of their dog-sniff and their search of the car, the Court believes the officers headed to the Embassy Suites highly anxious to search that room.

16

establish actual authority to consent, *Chavez Loya* is of limited applicability to the present case.  A vehicle search as was involved in that case is both legally and functionally different from the search of a hotel room.[8]

In the context of a hotel room search, actual or apparent authority is established when the consenting party is a registered guest, or if not registered, checked in with the registered guest and/or spent the night with the registered guest.  *United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008).  If it is unclear whether the person giving consent has such authority, "officers have a duty to seek further information in order to determine whether they may reasonably infer that the inviter has the necessary authority to consent to an entry or search of the premises."  *United States v. Rosario*, 962 F.2d 733, 738 (7th Cir. 1992); *see also See United States v. Kimoana*, 383 F.3d 1215, 1222 (10th Cir. 2004)("where an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent.").

Here, the Government has not established that Gavino gave consent to search the back bedroom and, even assuming she did so, that she had either actual or apparent authority to do it.  Gavino did consent to the officers' entry into the room. Tr. at 70.  Once inside, the officers saw a methamphetamine pipe in plain sight.  But the presence of the methamphetamine pipe was not an arrestable offense and did not provide officers sufficient probable cause to obtain a warrant.  Tr. at 136.

The Government failed to meet its burden to establish that Gavino consented to a search of the bedroom.[9]  Officer Gruber testified he asked Gavino whether he could

---

[8]     Additionally, in *Chavez Loya* the vehicle's driver was present when the search was consented to, but Anguiano was not present when consent was given to search the room registered in his name.

search the "room" and her belongings, to which she consented.  Tr. at 75, 305. Sergeant Cardenas initially could not recall hearing Officer Gruber ask, or Gavino give, consent to search the room. Tr. at 287. Rather, he recalled Gavino pointing to her suitcases in response to being asked consent to search those items. [10]  *Id.*  In his written report, Sergeant Cardenas wrote that Gavino consented to a "search of the items she identified as belonging to her," but made no mention of her consent to search the entire room. Tr. at 332-33. Later, Sergeant Cardenas for the first time testified that he had not heard Gavino consent because he had left the room.[11] Tr. at 333-34. However, Officer Gruber testified Gavino's consent to search her belongings and the room came in the "same conversation," contradicting Sergeant Cardenas testimony that he was present for Gavino's consent to search her belongings but not the room. Given their inconsistencies, the Court does not find either officer's testimony credible that Officer Gruber received consent to search any portion of the room itself.

Even if Officer Gruber did receive such consent to search the room in which Gavino and Baez were present, there is no evidence that consent extended to a search of the separate back bedroom, where the drugs were eventually discovered. The

---

[9]     Defendant Baez was not asked and did not give his consent to search the room or any of the personal belongings within it.  Tr. at 174-75.

[10]     The search of Gavino's personal belongings did not uncover any drugs or contraband.  However, it did provide evidence of a second vehicle, the Equinox.  But officers did not ask, nor receive, consent to search that vehicle.  Rather, they searched it later pursuant to a warrant.

[11]     This was not the only instance where the officers' testimony conflicted on critical aspects of the case.  Officer Gruber testified he believed he could have obtained a search warrant prior to entering the hotel room. Tr. at 133.  Sergeant Cardenas testified the officers lacked probable cause to obtain a warrant to search Anguiano's room when they arrived at the hotel. Tr. at 339.

Government has failed to establish Gavino's actual or apparent authority to search the back bedroom. The officers knew Anguiano was the sole registered guest, and did not initially know the context of Gavino's or Baez's presence in the room. Tr. at 129-30, 177. Upon entering the room, Gavino told officers she and Baez were staying with a "friend." But the officers did not know – and the record does not establish – whether Gavino and Baez checked in with Anguiano. Officer Gruber believed at the time Baez and Gavino did not rent the room. Tr. at 177. Nor does the evidence establish that their occupancy extended to the back bedroom or was restricted to the living room where they were seated and where their personal belongings were present. The back bedroom, where the drugs were hidden, is a separate room. Tr. at 288. That room also contained a locked armoire that neither Baez nor Gavino claimed dominion over. Tr. at 78-79.

The officers failed to determine Gavino's actual or apparent authority to consent to any search of the back bedroom. Instead, they conducted an intrusive search that involved a dog-sniff and pulling a panel off the sink cabinet, all without a warrant. By all indications the back bedroom lacked common occupancy and was exclusively Anguiano's domain. Tr. at 74-75, 78. Even when valid consent is given to search a portion of a hotel room or apartment, it does not extend to private portions that are not shared. *See State v. Thomas*, 598 N.W.2d 389, 391 (Minn. Ct. App. 1999) (holding that a girlfriend's valid consent to search a hotel room did not extend to her boyfriend's locked safe); *United States v. Waller*, 426 F.3d 838 (6th Cir. 2005)(holding an apartment renter lacked actual authority to grant consent to search a closed suitcase belonging to the tenant's overnight guest).

The discovery of the methamphetamine, which was hidden in the back bedroom, supplied the probable cause for the warrant to search the armoire and the Equinox. Because that warrantless search of the bedroom was conducted without proper consent, the evidence it uncovered must be suppressed.[12] That evidence led directly to the discovery of the contents of the armoire and the Equinox, and the arrest of Gavino and Baez. Accordingly, this evidence is fruit of the poisonous tree which likewise must be suppressed. *Segura v. United States*, 468 U.S. 796, 804 (1984); *Nardone v. United States*, 308 U.S. 338, 341 (1939).

Anguiano, Baez and Gavino were interviewed at the Bloomington Police Station the evening of their arrest.[13] Tr. at 217-225. The fruit of the poisonous tree extends to not only "primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." *Segura*, 468 U.S. at 804 (1984) (quotations omitted). While each defendant was properly Mirandized, their statements are still tainted as fruit of the poisonous tree. *See Brown v. Illinois*, 422 U.S. 590, 602 (1975)("in order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken. [sic] *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be sufficiently an act of free will to purge the primary taint.")(quotations omitted); *United States v. Reinholz*, 245 F.3d 765,

---

[12]    The presence of a methamphetamine pipe in the living room, a petty misdemeanor, did not justify extending the search. Tr. at 136, 325. As Sergeant Cardenas testified, had Gavino not consented to a room search, they would have been unable to proceed because they lacked probable cause for a warrant. Tr. at 339.

[13]    Baez and Anguiano's Motions do not move to suppress Gavino's post-arrest statements. Thus, we need not rule on their admissibility.

780 (8th Cir. 2001)(holding that "Miranda warnings did not purge the taint of [an] illegal arrest" because "they followed directly from [an] illegal arrest and no intervening event purged the taint."). Here, Defendants were interrogated immediately following their booking. Tr. at 217-225. Their interviews directly resulted from the illegal arrest of Anguiano and the illegal search of his room, and no intervening events purged the taint of those improprieties. There is no indication that Defendants would have freely interviewed with officers if they were not already in custody and under arrest, and it is the Government's burden to prove admissibility. *Brown*, 422 U.S. at 604. Accordingly, their statements must be suppressed.

## CONCLUSION

While the law does not demand perfection from police, it does require they have probable cause for an arrest and valid consent or a warrant to conduct a search of a residence. Here, the officers followed their instinct at the expense of following the law. As a result, they improperly arrested Anguiano and improperly searched his hotel room. Accordingly the evidence they found as a result, including their post-arrest interviews, must be suppressed.

## RECOMMENDATION

For the reasons set forth above, IT IS RECOMMENDED THAT:

1.      Defendant Rodolfo Anguiano, Jr.'s Motion for Suppression [Docket No. 67] be GRANTED;

2.      Defendant Kelvin Baez's Motion to Suppress (joined by Defendant Rodolfo Anguiano, Jr.) [Docket No. 41] be GRANTED;

3.      Defendant Kelvin Baez's Motion to Suppress Statements, Admissions and Answers (joined by Defendant Rodolfo Anguiano, Jr.) [Docket No. 51] be GRANTED; and

4.      Defendant Kelvin Baez's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (joined by Defendant Rodolfo Anguiano, Jr.) [Docket No. 53] be GRANTED.

Dated:          October 23, 2017

                                        _s/ David T. Schultz_
                                        DAVID T. SCHULTZ
                                        United States Magistrate Judge

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).