## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

                Plaintiff,

    v.

Rodolfo Anguiano, Jr. (1) and
Kelvin Baez, a/k/a "Taliban" (2),

                Defendants.

**MEMORANDUM OPINION
AND ORDER**
Criminal No. 17-135 ADM/DTS

---

David P. Steinkamp, Assistant United States Attorney, Minneapolis, MN, on behalf of Plaintiff.

John J. Leunig, Esq., and Justin J. Duffy, Esq., The Law Office of John J. Leunig, Minneapolis, MN on behalf of Defendant Rodolfo Anguiano, Jr.

Patrick G. Leach, Esq., Leach Law Office LLC, St. Louis Park, MN on behalf of Defendant Kelvin Baez.

---

## I. INTRODUCTION

This matter is before the undersigned United States District Judge for a ruling on Plaintiff United States of America's (the "Government") Amended Objection [Docket No. 156] to Magistrate Judge David T. Schultz's October 23, 2017 Report and Recommendation [Docket No. 138] ("R&R"). In the R&R, Judge Schultz recommends granting Defendant Rodolfo Anguiano, Jr.'s ("Anguiano") Motion for Suppression [Docket No. 67] and granting Defendant Kelvin Baez's ("Baez") Motion to Suppress [Docket No. 41]; Motion to Suppress Statements, Admissions, and Answers [Docket No. 51]; and Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 53].[1] The Government objects to the R&R's

---

[1] Anguiano joins in all three of Baez's Motions.

recommendation that all of the motions be granted. For the reasons set forth below, the Amended Objection is overruled in part and sustained in part.

## II. BACKGROUND[2]

### A. Procedural Issues

The Government's initial Objection [Docket No. 147] exceeded the word count limit in Local Rule 72.2(c) and did not include a certificate of word count compliance as required in Local Rule 72.2(c)(3). Anguiano and Baez moved to strike the Government's initial Objection for failure to comply with the word count limit. See Anguiano's Mot. Strike [Docket No. 151]; Baez's Mot. Strike [Docket No. 155]. The Motions to Strike also requested dismissal of the Indictment and release from custody. Id. The Court allowed the Government to file an Amended Objection and gave Defendants Anguiano and Baez 14 days to respond. See Order [Docket No. 157]. Accordingly, the Court grants the Motions to Strike to the extent the Motions request that the Government's initial Objection be stricken, and denies the Motions to Strike to the extent the Motions request dismissal of the Indictment and release from custody.

### B. Traffic Stop and Arrest of Anguiano

On May 5, 2017, at approximately 7:15 p.m., while on routine patrol, Bloomington Police Officer Jacob Gruber ("Officer Gruber") was parked near the Days Inn in West Bloomington when he observed a red Volkswagen Jetta with California license plates enter the Days Inn parking lot. Hr'g Tr. [Docket Nos. 114, 115] at 33–34, 36–38. Officer Gruber had seen the red Jetta in the Days Inn parking lot about a week earlier. Id. at 38. Officer Gruber

_____

[2] The background is derived from a two-day hearing conducted by Judge Schultz during which three Bloomington law enforcement officers testified and several exhibits, including the squad video from Anguiano's arrest, were submitted.

regularly patrolled the hotel area near the Days Inn and considered it to be a "high crime" area of drug trafficking, prostitution, and other crimes typically occurring in an area of moderately priced hotel franchises.  Id. at 36–37, 93.  He routinely checked the registration of the vehicles in the Days Inn parking lot and checked the hotel roster for the names of the people staying there.  Id. at 38.  On the day he first saw the Jetta, he learned from his routine checks that its registration was expired and that the registered owner, Elizabeth Sanchez, was not listed on the hotel roster.  Id.

When Officer Gruber observed the Jetta on May 5, he began to follow it as it left the Days Inn parking lot.  Id. at 41–42.  While trailing the Jetta, Officer Gruber performed a vehicle registration check and confirmed that the registration was still expired.  Id. at 42.  When the car's tires crossed over the lane divider, Officer Gruber activated his squad's lights and stopped the Jetta.  Id. at 43–44.

When Officer Gruber approached the Jetta, the first thing he noticed was an "overwhelming odor of air fresheners."  Id. at 46.  He observed in plain view of the car's interior dryer sheets all over the floor in the front and back of the car.  Id.  Officer Gruber knew from his narcotics training that drug traffickers have used dryer sheets to mask the odor of the drugs to frustrate drug-detecting canines detecting the drugs.  Id. at 35, 48.

Anguiano, the driver, was the sole occupant in the vehicle.  Id. at 45.  Officer Gruber requested Anguiano's license and proof of insurance and asked if he owned the vehicle.  Gov't Ex. 2 ("Video Tr.") at 2; Hr'g Tr. at 49.  Anguiano responded that he just bought the vehicle, had not yet registered it, and did not have the title with him.  Video Tr. at 2–3; Hr'g Tr. at 50.  He stated that he had purchased the vehicle at an auction.  Video Tr. at 22.  Anguiano also lacked

documentary proof of insurance, but told Officer Gruber that the vehicle was covered under his policy for 30 days. Video Tr. at 5; Hr'g Tr. at 49. When Officer Gruber mentioned the presence of the dryer sheets, Anguiano replied that the car had a leak and smelled like gas. Video Tr. at 11.

Anguiano told Officer Gruber that he had been in town for three days to attend a cousin's wedding that was taking place on Saturday. He said he had initially been staying at the Days Inn and was now staying at the nearby Embassy Suites on American Boulevard, where he was headed before he was stopped. Video Tr. at 3–4, 6; Hr'g Tr. at 50–51.

When Officer Gruber told Anguiano that he had seen the Jetta at least a week earlier, Anguiano explained that his cousin had driven the car to Minnesota and that he had flown because he had to work. Video Tr. at 11, 19; Hr'g Tr. at 51–52. Based on his training, Officer Gruber was aware that drug traffickers commonly pay another person drive their "load" car to a location and then fly to the location to retake possession of the car. Hr'g Tr. at 52. When Officer Gruber asked Anguiano how he was getting back, he responded that he was going fly home on Monday and would be selling the car, as he frequently buys and sells cars. Video Tr. at 20, 22–23.

Officer Gruber requested a criminal history report from dispatch and learned that Anguiano had prior arrests for "alien smuggling, controlled substance, and . . . possession of pills." Hr'g Tr. at 52–53, 101. When Officer Gruber asked Anguiano if he had ever been "in trouble for narcotics" or "arrested before," Anguiano said he had been arrested before but only

for diet pills and not for narcotics.[3]  Video Tr. at 12.  Officer Gruber felt Anguiano was "being dishonest or at least evasive about questions," and that he was "lying about certain things or at least what [Officer Gruber] believe[d] to be lies."  Hr'g Tr. at 54–55.

Based on his suspicion of drug trafficking, Officer Gruber called a K-9 handler and drug-detecting canine to the scene.  Id. at 53–54.  The handler told Officer Gruber that the canine had shown interest in the undercarriage but did not give a final alert.  Id. at 57.  Officer Gruber returned to his squad car and spoke with another officer about how to proceed.  Video Tr. at 27–28.  He decided he would release Anguiano without giving him a ticket.  Hr'g Tr. at 58.

When Officer Gruber returned to Anguiano's car and handed back his license, Anguiano opened his wallet and Officer Gruber saw a Drug Enforcement Agency ("DEA") badge affixed to the inside flap of the bifold wallet.  Id. at 58–61; Gov't Ex. 4.  The badge wallet held about a dozen plastic cards that Officer Gruber presumed to be credit cards.  Hr'g Tr. at 59.  Officer Gruber asked Anguiano to step back out of his car and explain why he had the DEA badge.  Video Tr. at 26.  Anguiano explained that he had purchased the badge through eBay for Halloween "a long time ago" and now carried it with his credit cards.  Id.; Hr'g Tr. at 62; Video Tr. at 26.  Using his cell phone, Anguiano showed Officer Gruber websites that sold fake DEA badge wallets.  Hr'g Tr. at 107.

---

[3] Officer Gruber testified that Anguiano's criminal history report was sent to him by email and that "it looked like" Anguiano had three arrests.  Hr'g Tr. at 101.  Officer Gruber also testified that the report "is one of the most convoluted and difficult-to-read documents in the world."  Nevertheless, Officer Gruber testified that the controlled substance arrest and "pill" arrest were two separate arrests and that he felt Anguiano was not being truthful with him about his drug arrest history.  Id. at 102.

Officer Gruber returned to his squad car and called Sergeant Cory Cardenas ("Sergeant Cardenas") to discuss the badge in Anguiano's wallet.[4] Id. at 63, 271, 273. In turn, Sergeant Cardenas called Detective Tom Maloney ("Detective Maloney") to determine whether the badge was real and whether it had been stolen. Id. at 204, 206, 276–77. Detective Maloney reviewed a DEA contact list and determined that Anguiano was not a DEA officer. Id. at 206. He also contacted the DEA's Intelligence Center in El Paso, Texas to ask if Anguiano was a subject of other DEA investigations. Id. at 208–09. Detective Maloney learned that Anguiano was not currently under investigation but had "a prior arrest for alien smuggling and some kind of drug case," and had crossed the Mexico/United States border about 20 times in the last "couple" of years. Id. at 209–10. Detective Maloney then called Sergeant Cardenas back and relayed this information. Id. at 210. Through his discussions with Detective Maloney, Sergeant Cardenas became "a hundred percent sure" that the badge was not real. Id. at 275–76.

Sergeant Cardenas drove to the scene, where he and Officer Gruber arrested Anguiano. Id. at 276. Officer Gruber initially testified that he arrested Anguiano for identity theft but later stated Anguiano was arrested for both identity theft and obstructing legal process. Id. at 63, 115–16. Sergeant Cardenas testified that Anguiano was arrested for obstructing legal process. Id. at 276.

**C. Search of Anguiano's Car**

Following the arrest, Anguiano's car was searched. Id. at 64, 279. The officers found a satchel with an imitation DEA badge and imitation FBI badge, four $1,000 bundles of cash, and

---

[4] Officer Gruber pressed the mute button on his squad's audio recorder before calling Sergeant Cardenas and did not turn the audio back on for the remainder of the stop. Hr'g Tr. at 91–92. Therefore, the squad video is muted from this point forward.

6

credit cards with names other than Anguiano's.  Id. at 64–65.  The Jetta interior appeared to have been altered because the dashboard was loose and came apart easily.  Id. at 65, 279–80.  No drugs or contraband were found in the vehicle.  Id. at 65, 116–17.  The car was impounded and Anguiano was transported to the Bloomington jail.  Id. at 65–66.

**D.  Search of Hotel Room**

After the car was towed away, Officer Gruber drove to the nearby Embassy Suites to continue his investigation.  Id. at 67, 128–30.  The front desk confirmed that Anguiano was registered to room 714.  Id. at 68.  Officer Gruber, Sergeant Cardenas, and a third officer, Officer Danner, went to the room and knocked on the door.  Id. at 68, 129–30.  From inside the room, a woman later identified as Defendant Zyaira Marie Gavino ("Gavino") moved a curtain from an interior window next to the door and looked out at the three uniformed officers.  Id. at 69.  She then opened the door, and Sergeant Cardenas asked her if they could come inside and speak to her about a "matter."  Id. at 70, 283–84.  Gavino opened the door wider, stepped back, and waved her arm to gesture the officers into the room.  Id. at 70, 285.

Immediately inside Room 714 was a living room area that included a pull-out couch and a sink.  Id. at 71, 76, 191, 304.  A separate bedroom was down a small, open hallway.  Id. at 71, 76.  A man later identified as Baez was sitting on the couch in the living room.  Id. at 71.  Gavino told Officer Gruber that they were there visiting a friend at the hotel and had been staying with him a few days.  Id. at 75.  Gavino stated that she knew the friend only by his nickname.  Id.

When initially scanning the living room, Officer Gruber and Sergeant Cardenas observed a glass methamphetamine pipe with residue in plain view on an end table next to Baez.  Id. at

72–73, 286.  Officer Gruber also saw a backpack, suitcase, and other luggage in the living room where Baez and Gavino were sitting.  Id. at 72.  Upon observing the methamphetamine pipe, Sergeant Cardenas left the room to speak with the front desk about what had been found and to ask if the hotel staff wanted to evict Gavino and Baez.  Id. at 286–87.

Officer Gruber testified that he asked for Gavino's consent to search.  Id. at 75.  She said yes and pointed to a suitcase, backpack, and bags that were hers.  Id.  Officer Gruber further testified that he then requested and received Gavino's consent to search the room.  Id.  Sergeant Cardenas was present during the conversation in which Gavino gave consent to search her personal items, but did not hear Officer Gruber ask if he could search elsewhere in the room.  Id. at 333.  Sergeant Cardenas testified that he may have left the room to go to the front desk at the time Officer Gruber asked for and received permission to search the entire room.  Id.

Officer Gruber searched Gavino's backpack and found a small bag with four .22 round bullets.  Id. at 78.  The backpack also contained an owner's manual for a Chevy Equinox that matched a set of GM keys Officer Gruber saw in plain view on the living room couch.  Id.

Officer Gruber then began to search the entire suite.  Id. at 76–79.  The back bedroom contained a large armoire that was locked with a rigid chain lock.  Id. at 76–77.  The officers also observed in plain view what appeared to be pound packaging in an open-topped garbage can in the back bedroom.  Gov't Ex. 5 ("Search Warrant Aff.") at 3.  In the far corner of the bedroom, the officers observed that a cell phone had been propped up to face the armoire.  Hr'g Tr. at 77.  The cell phone appeared to be monitoring the armoire by streaming a live video image from the phone camera to a Facebook Live website.  Id.  Officer Gruber asked Baez where narcotics might be if any were in the room, and he testified that Baez responded, "Well, in the armoire,

obviously." Id. at 79.  Based on this comment, Officer Gruber requested a K-9 officer to conduct a dog sniff of the room.  Id.  at 81.  The drug dog alerted to the armoire and to a dresser next to it.  Id.

Officer Gruber "popped off" the front panel of a sink cabinet in the back bedroom and found a plastic bag that contained a pillowcase with two large bundles of what he believed to be multiple pounds of methamphetamine.  Id. at 79.  Upon finding the suspected drugs, the officers decided to freeze the room and obtain a search warrant to search the rest of the room, including the armoire, and the Chevy Equinox.  Id. at 80.

After the search warrant arrived, the officers searched the armoire and found additional methamphetamine and a handgun.  Id. at 83–84.  They also searched the Chevy Equinox and found methamphetamine, marijuana, and a gun.  Id. at 84.

Gavino and Baez were then arrested and transported to the Bloomington police department, where they were interviewed separately.  Id. at 82–83, 217, 220–21.

### E.  Motions to Suppress, R&R, Objections

Anguiano, Baez, and Gavino were indicted for Conspiracy to Distribute Methamphetamine and Possession with Intent to Distribute Methamphetamine.  Indictment [Docket No. 28].  All three Defendants filed motions to suppress evidence obtained through Fourth Amendment violations.  Gavino subsequently entered a plea of guilty to Using a Communication Facility to Commit a Drug Trafficking Felony and withdrew her motion to suppress.  See Plea Hr'g Minutes [Docket No. 123]; Felony Information [Docket No. 121].  Thus, the R&R addresses Anguiano and Baez's suppression motions.

In the R&R, Judge Schultz found that the traffic stop of Anguiano was constitutional because the stop and its prolonged duration were supported by reasonable suspicion. R&R at 8–10.[5] However, Judge Schultz concluded that the police officers lacked probable cause to arrest Anguiano and search his car without a warrant. The R&R thus recommends suppressing Anguiano's post-arrest statements and the evidence seized from the car. Additionally, Judge Schultz found that the officers lacked valid consent to search the back bedroom of the hotel suite and that the improper discovery of the methamphetamine in the sink cabinet supplied the probable cause for the later-obtained search warrant. He thus concluded that the searches of the armoire and Equinox were also improper. Judge Schultz further determined that the illegally obtained evidence resulted in Baez's arrest and his post-arrest statements. The R&R thus concluded that the evidence is fruit of the poisonous tree and must be suppressed as to Anguiano and Baez.

The Government objects, arguing that Anguiano's arrest, the search of his vehicle, and the search of the hotel suite were all constitutionally valid. The Government further contends that even if Anguiano's Fourth Amendment rights were violated, the evidence need not be suppressed as to Baez because Baez lacked a privacy interest in the back bedroom of the hotel suite and thus his Fourth Amendment rights were not violated.

## III. DISCUSSION

### A. Standard of Review

A district judge may refer a defendant's motion to suppress evidence to a magistrate judge for recommendation. Fed. R. Crim. P. 59(b)(1). The district judge must make an

---

[5] No party has objected to this finding and it is upheld here.

independent, de novo determination of those portions of the report and recommendation to which a party objects. Fed. R. Crim. P. 59(b)(3); 28 U.S.C. § 636(b)(1)(C); D. Minn. L.R. 72.2(b). A district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

**B. Compliance with Local Rules**

As an initial procedural matter, Anguiano and Baez argue that the Amended Objection should be overruled for failure to comply with the local rules. Anguiano argues that the Amended Objection is untimely, and Baez argues the Amended Objection exceeds the word limit because it incorporates by reference the 2,300-word Factual Background section of the Government's initial Objection.

Both arguments are rejected. The Court granted the Government leave to file the Amended Objection and Defendants were given a full 14 days to respond. Thus, the Amended Objection is timely. Additionally, the Amended Objection does not exceed the word count limit because the background section of the Government's initial Objection was stricken along with the initial Objection. The Court thus proceeds to the merits of the Government's Amended Objection.

**C. Arrest of Anguiano**

The Government objects to the R&R's conclusion that Anguiano was arrested without probable cause. The Government argues that the officers had probable cause to arrest Anguiano for several crimes.

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches

11

and seizures." To be constitutionally valid, a warrantless arrest must be based on probable cause. Beck v. Ohio, 379 U.S. 89, 91 (1964). "Probable cause exists to make a warrantless arrest when, at the moment of the arrest, the collective knowledge of the officers involved was 'sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" United States v. Wajda, 810 F.2d 754, 758 (8th Cir. 1987) (quoting Beck, 379 U.S. at 91). "[P]robability, and not a prima facie showing, of criminal activity is the standard of probable cause." Illinois v. Gates, 462 U.S. 213, 235 (1983) (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)).

The probable cause determination is a "practical, commonsense, and non-technical determination." United States v. Reiner Ramos, 818 F.2d 1392, 1394 (8th Cir. 1987) (internal quotations omitted). The facts must be analyzed for their cumulative effect in the totality of the circumstances, rather than in isolation. Id. Police may rely upon their law enforcement experience to draw reasonable inferences of criminal activity from circumstances that the general public would consider innocuous. Wajda, 810 F.2d at 758. Acts that appear to be innocent when viewed separately will frequently provide the basis for probable cause when they are viewed together. Gates, 462 U.S. at 243 n.13 (1989). "In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts." Id.

Courts assessing the validity of a warrantless arrest must ignore the officers' subjective motive for the arrest and focus solely on the objective question of whether probable cause existed. United States v. Clarke, 110 F.3d 612, 614 (8th Cir. 1997) (citing Whren v. United States, 517 U.S. 806, 812–13 (1996)). This is because "subjective intent alone does not make

12

otherwise lawful conduct illegal or unconstitutional."  Whren, 517 U.S. at 813 (alterations

omitted).  In other words, "the fact that the officer does not have the state of mind which is

hypothecated by the reasons which provide the legal justification for the officer's action does not

invalidate the action taken as long as the circumstances, viewed objectively, justify that action."

Scott v. United States, 436 U.S. 128, 138 (1978).  "The test of probable cause is not the

articulation of the policeman's subjective theory but the objective view of the facts."  United

States v. O'Connell, 841 F.2d 1408, 1419 (8th Cir. 1988).

Upon viewing the facts objectively and for their cumulative effect and ignoring the

officers' subjective theories and intent, the Court agrees with Judge Schultz's conclusion that the

officers lacked probable cause to arrest Anguiano.  Although the totality of the circumstances

certainly gave rise to a reasonable suspicion of criminal activity, they did not amount to a

"probability" that a crime was being or had been committed.  See Spinelli, 393 U.S. at 419

("[P]robability . . . of criminal activity is the standard of probable cause." ); Gates, 462 U.S. at

235 (same).

### 1.  Drug Trafficking

The Government argues that Officer Gruber was aware of numerous facts which, when

viewed objectively, would support probable cause to believe that Anguiano was engaged in a

drug trafficking conspiracy.  However, many of the facts cited by the Government to support

probable cause are either not in the record, misstate the record, or are unrelated to drug

trafficking.

For example, the Government argues that having expired license tabs and failing to show

proof of insurance are actions consistent with the conduct of drug traffickers.  Each of these

items are also consistent with other less nefarious conduct and may raise "suspicion" but not "probability" of drug trafficking.  Officer Gruber's testimony that parking in a hotel parking lot for 7 to 10 days lends no significant support to the probability of involvement in drug trafficking. Hotels serve as lodging for many purposes, such as work assignment, that require more than a stay of a day or two.

Similarly, the Government does not articulate how Anguiano's past arrest for alien smuggling and his possession of a dozen presumed credit cards bear on whether he may be engaged in drug trafficking.  Thus, these facts, even when considered in conjunction with all other known facts, lend very little weight to pushing the level of suspicion over the threshold to probable cause.

The Government also contends that Anguiano did not know who he had purchased the vehicle from or when his cousin's wedding was to occur.  See Am. Obj. at 2.  However, the record shows that Anguiano told Officer Gruber he had purchased the vehicle at an auction, and twice stated that his cousin's wedding was on Saturday.

The Government also argues that Anguiano lied about a prior drug arrest.  However, Officer Gruber asked Anguiano if he had ever been "in trouble for narcotics" or "arrested before," and Anguiano stated he had been arrested before but only for diet pills and not for narcotics.  Although Officer Gruber believed that Anguiano had two separate drug-related arrests—one for controlled substances and one for "pills or pharmaceuticals or something like that"—he also testified that the criminal history reports he receives from dispatch are among "the most convoluted and difficult-to-read documents in the world."  Hr'g Tr. at 101.  Additionally, Detective Maloney had relayed to Sergeant Cardenas that Anguiano had been arrested

twice—"for alien smuggling and some kind of drug case." Id. at 208–09. Based on the collective knowledge of the officers, Anguiano's possible "lie" about his drug arrest history does not do much to advance the probability of drug trafficking.

This leaves the following facts from which to determine whether probable cause for drug trafficking existed: Anguiano was driving a car that was not registered to him; his cousin had driven the car from California, a known drug source state, and Anguiano had flown to Minnesota after the car arrived, which is a common travel pattern for drug traffickers; the floor of the car was covered with dryer sheets, which are commonly used by drug traffickers to mask the scent of narcotics; the drug dog showed "interest" but did not alert to the undercarriage of the car; Anguiano had a prior drug arrest (not conviction); and he was in possession of a DEA badge that Sergeant Cardenas had confirmed to be fake.

This combination of circumstances does raise a legitimate and reasonable suspicion that Anguiano was engaged in drug trafficking. See, e.g., United States v. Sokolow, 490 U.S. 1, 4–9 (1989) (finding reasonable suspicion for drug smuggling where defendants paid $2,100 in cash for airplane tickets, traveled under an alias, checked no luggage, and stayed in a drug source city for only 48 hours even though the round trip flight took 20 hours). However, the cumulative effect of this set of circumstances is not sufficiently compelling to allow a reasonable officer to conclude that he had probable cause to arrest for trafficking drugs. The record lacks the strong factors typically associated with establishing probable cause, such as a corroborated informant's tip or the observation of drug-related packaging, paraphernalia, or other items. Although such "smoking gun" facts are not required to establish probable cause, the degree of suspicion

15

culminating from the set of circumstances here does not push the needle from reasonable suspicion to probable cause for an arrest for drug trafficking.

### 2. Obstructing Legal Process, Identity Theft

In the R&R, Judge Schultz also found that the officers lacked probable cause to arrest Anguiano for obstructing legal process and identity theft, the crimes identified at the scene as the basis for arrest. The Court agrees. Although without the benefit of the audio due to Officer Gruber turning it off, the police video of the traffic stop shows Anguiano cooperating, rather than obstructing legal process, at the time of his arrest. Anguiano is shown handing over the fake DEA badge within six seconds of Gruber's request to view it. See Ex. 1, 19:53:08–19:53:26. Further, after being questioned about the badge, the video shows Anguiano opening the doors and trunk to his car to allow the officers to search the vehicle. Therefore, the record does not establish Anguiano was obstructing legal process.

Additionally, Officer Gruber lacked probable cause to arrest Anguiano for financial transaction fraud or identity theft. At the time of the arrest, Officer Gruber had seen only the edges of the plastic cards in Anguiano's wallet and did not know how many of them were credit cards (as opposed to a gym membership card, key card, library card, etc.). Hr'g Tr. at 113–15, 198. There had been no inspection of the cards to determine whether they were in his or someone else's name. Id. at 198. Officer Gruber also admitted under cross examination that he had never heard of a credit card fraud case where a suspect used a fake law enforcement badge as identification to lend credibility to the scheme. Id. at 109–111. Additionally, Anguiano had not brandished the badge or attempted to pass himself off as a DEA officer. Thus, the totality of

16

the circumstances did not establish probable cause to arrest Anguiano for identity theft or financial transaction fraud.[6]

Because the R&R correctly determined that Anguiano was arrested without probable cause, the Government's objection on this issue is overruled. All statements made by Anguiano subsequent to his unlawful arrest are suppressed.

**D. Search of Anguiano's Car**

The Government also objects to the R&R's conclusion that the search of Anguiano's car was improper. The Government argues that Anguiano's vehicle was properly searched pursuant to arrest, and also that the evidence in the vehicle would inevitably have been discovered during a routine inventory search that police would have conducted following Anguiano's arrest. These arguments are unavailing because Anguiano's arrest was constitutionally unlawful. Since his arrest was improper, the search of the car incident to the arrest or as part of a routine inventory search was also improper.

The Government next argues if not made incident to a lawful arrest, the search was valid under the automobile exception. The automobile exception to the warrant requirement authorizes law enforcement officers to search a vehicle if the officers have probable cause to believe that evidence of a crime will be found in the vehicle. Pennsylvania v. Labron, 518 U.S. 938, 940 (1996); United States v. Cortez-Palomino, 438 F.3d 910, 913 (8th Cir. 2006). "Probable cause exists 'where, in the totality of the circumstances, there is a fair probability that

---

[6] The Government does not argue, nor can it, that the officers thought the badge was stolen. Sergeant Cardenas testified that he had confirmed with Detective Maloney that the badge was not real and was "a hundred percent sure" of this fact before he arrested Anguiano. Hr'g Tr. at 276.

17

contraband or evidence of a crime will be found in a particular place.'" Cortez-Palomino, 438

F.3d at 913 (quoting United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005)). As

discussed above, the totality of the circumstances amounted only to a reasonable suspicion, not

probable cause, that Anguiano was trafficking drugs. Thus, the automobile exception does not

apply here.

Accordingly, the R&R correctly concluded that the warrantless search of Anguiano's car

was unconstitutional and that the evidence obtained from the search of the Jetta must be

suppressed under the exclusionary rule. See United States v Calandra, 414 U.S. 338, 347 (1974)

("[E]vidence obtained in violation of the Fourth Amendment cannot be used in a criminal

proceeding against the victim of the illegal search and seizure."). The Government's objection

on this issue is overruled.

**E.  Search of the Hotel Room**

**1.  Scope of Consent**

The R&R concluded that although Gavino gave consent for the officers to enter the front

room of the hotel suite and search her personal items, she did not give consent to search the back

bedroom. R&R at 16–19. The Government objects to this conclusion and argues that the

testimony of Officer Gruber showed that Gavino gave unconditional consent to search the entire

suite.

"The Fourth Amendment's general prohibition against warrantless searches does not

apply when officers obtain voluntary consent from the person whose property is searched or

from a third party with common authority over the property." Illinois v. Rodriguez, 497 U.S.

177, 181 (1990).

In analyzing the scope of Gavino's consent, Judge Schultz concluded that the officers gave contradictory testimony as to whether Gavino gave consent to search the hotel room, because Sergeant Cardenas only heard Gavino consent to a search of a backpack and other luggage, whereas Officer Gruber testified that in the same conversation he also received permission from Gavino to search the entire suite.  See R&R at 18.  However, Officer Gruber's testimony under oath that Gavino consented to a search of the hotel room is not directly contradicted by Sergeant Cardenas' testimony, because Sergeant Cardenas testified that he may have been out of the room when Gavino agreed that Officer Gruber could search the entire room. Hr'g Tr. at 333.

By allowing the officers to enter Room 714 and giving him consent to search the "room," and not confining her consent to the living room, Officer Gruber could have reasonably concluded that Gavino gave consent to search the entire two-room suite.  See, e.g., United States v. Jones, 523 F.3d 31, 39 (1st Cir. 2008) (holding that officer's consent to search "motel room" included consent to search entire two-bedroom suite rather than just the bedroom in which he had been placed).

### 2.  Authority to Consent

The R&R concluded that even if Gavino gave verbal consent to search the back bedroom, she did not have actual or apparent authority to do so.  The Government objects to this conclusion and argues that as a guest in a hotel room rented by another person, Gavino had authority to consent to a search of the room.

"Valid third party consent can arise either through the third party's actual authority or the third party's apparent authority."  United States v. Chavez Loya, 528 F.3d 546, 554 (8th Cir.

2008) (quoting <u>United States v. Andrus</u>, 438 F.3d 711, 716 (10th Cir. 2007)).  Actual authority

exists if the third party either has "mutual use of the property by virtue of joint access," or has

"control for most purposes."  <u>Id.</u>  Apparent authority exists when "an officer reasonably, even if

erroneously, believes the third party possesses authority to consent."  <u>Id.</u>

Here, Officer Gruber reasonably believed Gavino had authority to consent to a search of

the entire hotel suite.  She and Baez were alone in the suite when the police arrived, and Gavino

demonstrated control over the room by permitting the officers to enter.  Additionally, she told

the officers that she and Baez had been staying in the hotel room for a few days, thereby

establishing their mutual use of the suite.  Thus, at the time Officer Gruber obtained consent to

search the hotel room, Gavino had apparent authority to give consent.  <u>See, e.g.</u>, <u>United States v.

Rodriguez</u>, 414 F.3d 837, 844 (8th Cir. 2005) (holding that defendant's girlfriend had authority

to consent to search of motel room registered to defendant because she exercised control over the

room by living in it).

Additionally, under the circumstances here, once the officers entered the room legally

with Gavino's permission, they were entitled to perform a cursory visual inspection of the

immediately adjoining spaces in the hotel room to ensure officer safety.  "A protective sweep is

permitted under the Fourth Amendment when an officer has articulable facts which, taken

together with the rational inferences from those facts, would warrant a reasonably prudent officer

in believing that the area to be swept harbors an individual posing a danger to those on the . . .

scene."  <u>United States v. Ortega-Montalvo</u>, 850 F.3d 429, 434 (8th Cir. 2017) (internal

quotations omitted).  "Protective sweeps need not always occur in conjunction with an arrest"

where "a reasonable officer could conclude that it was necessary for his safety to secure the premises before obtaining a warrant."  Id.

Here, when the officers entered the hotel room, two persons not registered with the hotel were occupying the hotel room's living area, and the officers did not know if others might be in the back bedroom.  Hr'g Tr. at 282, 284–85.  Additionally, prior to entering the back bedroom, the officers found bullets in Gavino's luggage, raising the potential that firearms were present. Id. at 78–79.  Thus, a reasonable officer could conclude that a cursory visual inspection of the adjoining bedroom in the hotel suite was justified to ensure officer safety.

Upon entering the back bedroom the officers could see in plain view the elaborate cell phone surveillance system and the visibly padlocked armoire.  At this point, the officers became aware of facts strongly suggesting that Gavino did not have mutual use or control of the back bedroom and that the occupant had an expectation of privacy.  Thus, the officers should have known and respected that Gavino lacked authority to consent to a search of that room.

At that point, Officer Gruber's belief that he had valid third-party consent was no longer reasonable, and the officers should have stopped their search, frozen the scene, and applied for a search warrant.  Instead, Officer Gruber conducted an intrusive search of the sink cabinet in the back bedroom by removing a panel from the cabinet and searching the space inside.  The warrantless search of the back bedroom sink was improper and the suspected methamphetamine found in the sink cabinet must be suppressed, as recommended in Judge Schultz's R&R.

### 3.  Validity of Search Warrant

The Government argues that even if the illegally obtained information from the search of the hotel suite and Anguiano's unlawful arrest are removed from the search warrant affidavit, the

21

remaining portion of the affidavit would still establish probable cause. The Government thus contends that the after-acquired search warrant was valid and that the evidence found in the hotel room and Chevy Equinox search should not be suppressed.

When applying the exclusionary rule, the sufficiency of a warrant affidavit is evaluated after information from an unlawful search is deleted from the warrant affidavit. United States v. Davis, 760 F.3d 901, 903 (8th Cir. 2014); United States v. Templeman, 938 F.2d 122, 124–25 (8th Cir. 1991). If the affidavit is sufficient to establish probable cause without the improperly acquired information, the search warrant is valid. Templeman, 938 F.2d at 124–25.

Here, when the post arrest information and the seizure of the suspected methamphetamine under the sink are excluded from the search warrant affidavit, the affidavit still includes the following legally-obtained facts: Anguiano was driving a car with California license plates and an expired registration; his cousin had driven the car from California to Minnesota and he (Anguiano) had flown to Minnesota and was going to sell the vehicle and then fly home; dryer sheets were observed in plain view covering the floor of Anguiano's vehicle; Anguiano had a prior drug arrest in 2013; Anguiano had a fake metal DEA badge in his wallet that he said he had purchased online; Anguiano said he was staying at the Embassy Suites on American Boulevard; and in a room registered to Anguiano at that Embassy Suites officers observed in plain view a methamphetamine pipe, an armoire locked with a padlock, and what appeared to be pound packaging in an open-topped garbage can of the back bedroom. See Search Warrant Aff. at 2–3. These facts, even without the suspected methamphetamine from under the sink, cumulatively clear the threshold to establish probable cause to support a search

warrant for Room 714 and the Chevy Equinox. Thus, the evidence from the armoire and the Equinox was obtained pursuant to a valid search warrant and is admissible.

### 4. Suppression as to Baez

The Government objects to the finding in R&R that the methamphetamine and other evidence found in the back bedroom should be suppressed as it relates to Baez. The Government argues that if Anguiano had sole access and control of the back bedroom, then Baez had no expectation of privacy in that room and his Fourth Amendment rights were not violated. The Government further argues that because Baez's Fourth Amendment rights were not violated, the exclusionary rule does not apply.

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Rakas v. Illinois, 439 U.S. 128, 133–34 (1978). "[S]ince the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." Id. at 134 (internal citation omitted).

A person claiming the protection of the Fourth Amendment must have "a legitimate expectation of privacy in the invaded space." Id. at 143. "[T]he person challenging the search has the burden of showing both a subjective expectation of privacy and that the expectation is objectively reasonable; that is one that society is willing to accept." United States v. McCaster, 193 F.3d 930, 933 (8th Cir. 1999).

The Supreme Court has stated that society recognizes a hotel guest's expectation of privacy in the premises because the guest is provided with a private place to sleep, a secure place to keep belongings, and a measure of control over the premises. Minnesota v. Olson, 495 U.S.

91, 99 (1990). However, Baez was not a registered hotel guest; rather, he was a guest of a registered hotel guest who was also staying in the suite. Additionally, assuming without deciding that Baez had a privacy interest in the living room portion of the suite where he was sitting and where his luggage was located, he did not have a legitimate expectation of privacy in the back bedroom, which was being actively monitored through cell phone surveillance. A room with a surveillance system operating in plain view is not "a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable." See id. (quoting Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). Thus, Baez cannot show that he had an objectively reasonable expectation of privacy in the back room.

Therefore, the Court sustains the Government's objection that evidence uncovered in the search of the hotel room must be suppressed as to Baez. Because Baez had no expectation of privacy in the back bedroom where the drugs were found, his Fourth Amendment rights were not violated by the search of that room, and the exclusionary rule does not apply to him.

## F. Voluntariness of Baez's Statements

In Baez's Motion to Suppress Statements, Admissions, and Answers, he argued that his post-arrest statements were taken in violation of his Fifth Amendment right against self incrimination because his statements were not voluntary. See Baez's Mot. Suppress at 15–16. The R&R did not reach this issue because it concluded that Baez's statements must be suppressed under the exclusionary rule. Since the exclusionary rule does not apply to Baez, the Court will examine whether his statements were voluntary.

In assessing whether a defendant's Miranda waiver or statements are voluntary, courts "examine the totality of the circumstances to determine whether pressures exerted by the

24

authorities overwhelmed the defendant's will."  United States v. Rodriguez-Hernandez, 353 F.3d 632, 636 (8th Cir. 2003) (internal quotation marks omitted).  Baez argues that he was not in a proper frame of mind to give consent to his post-arrest statements because:  (1) a methamphetamine pipe was observed next to him at time he was arrested; (2) he was concerned for his wife who had been arrested and taken to an unknown location; and (3) he was also concerned for a friend who may or may not have been working with the police.

A review the transcript of Baez's interview with law enforcement agents shows his will was not overwhelmed by the interviewing agents.  See Government's Ex. 6.  Additionally, Baez was read his Miranda rights during the interview, was generally tracking and responsive during the interview, and did not appear to be under the influence of drugs.  Hr'g Tr. 252–55.  Thus, the record does not support Baez's argument that he was unable to knowingly waive his Miranda rights and agree to speak to the officers.

## IV.  CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Anguiano's Motion to Strike [Docket No. 151] is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is granted to the extent that it seeks to strike the Government's initial Objection [Docket No. 147] and denied to the extent that it requests dismissal of Indictment and Anguiano's release from custody.

2.  Baez's Motion to Strike [Docket No. 155] is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is granted to the extent that it seeks to strike the Government's initial Objection [Docket No. 147] and denied to the extent that it requests dismissal of Indictment and Baez's release from custody.

3.  The Government's Amended Objections [Docket No. 156] to the October 23, 2017 Report and Recommendation are **OVERRULED IN PART** and **SUSTAINED IN PART**;

4.     The Report and Recommendation [Docket No. 138] is **ADOPTED IN PART and DECLINED IN PART**;

5.     Defendant Rodolfo Anguiano, Jr.'s Motion for Suppression [Docket No. 67] is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is granted as to Anguiano's post-arrest statements, evidence found in the Jetta, and evidence found under the sink in Room 714.  The Motion is denied as to evidence seized as a result of the search warrant issued on May 6, 2017;

6.     Defendant Kelvin Baez's Motion to Suppress [Docket No. 41] is **DENIED**;

7.     Baez's Motion to Suppress Statements, Admissions, and Answers [Docket No. 51] is **DENIED**; and

8.     Baez's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 53] is **DENIED**.

BY THE COURT:


s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  December 19, 2017.

26