UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

      Plaintiff,

v.

Kelvin Baez, a/k/a "Taliban,"

      Defendant.

MEMORANDUM OPINION
AND ORDER
Criminal No. 17-135(2) ADM/DTS

___

Nathan H. Nelson, Assistant United States Attorney, United States Attorney's Office, Minneapolis, MN, on behalf of Plaintiff.

R.J. Zayed, Esq., Dorsey & Whitney LLP, Minneapolis, MN, on behalf of Defendant Kelvin Baez.

___

## I. INTRODUCTION

This matter is before the undersigned United States District Judge for a ruling on Defendant Kelvin Baez's ("Baez") Motion to Reconsider [Docket No. 189]. Baez asks the Court to reconsider its December 19, 2017 Memorandum Opinion and Order [Docket No. 160] ("Order") denying Baez's Motion to Suppress Statements, Admissions, and Answers [Docket No. 51] ("Motion to Suppress"). For the reasons set forth below, the Motion to Reconsider is denied.

## II. RELEVANT BACKGROUND[1]

On May 5, 2017, at approximately 7:15 p.m., while on routine patrol, Bloomington Police Officer Jacob Gruber ("Officer Gruber") pulled over Defendant Rodolfo Anguiano, Jr. ("Anguiano") for a traffic violation. Hr'g Tr. [Docket Nos. 114, 115] at 33–34, 37, 43–44.

___

[1] The full background of this case is set forth in the Order, which is incorporated by reference.

Anguiano told Officer Gruber that he was visiting from California to attend a cousin's wedding and was staying at the Embassy Suites on American Boulevard, which was a few blocks from the site of the traffic stop. Id. at 50–51. Officer Gruber observed dryer sheets spread over the front and back interior of Anguiano's car. Id. at 46. Based on this observation and Anguiano's answers to Officer Gruber's questions, Officer Gruber became suspicious that Anguiano was trafficking drugs. Id. at 54. A drug detecting canine was called to sniff the outside of the car. Id. The dog expressed interest in the undercarriage of the car but did not give a formal alert for drugs. Id. at 57. As Officer Gruber was returning Anguiano's driver's license, he saw an imitation Drug Enforcement Agency ("DEA") badge and about a dozen cards that appeared to be credit cards in Anguiano's wallet. Id. at 57–62. Anguiano was then arrested and brought to jail. Id. at 64, 66. Law enforcement officers performed an inventory search of the car and found a satchel containing $4,000 in cash, two additional imitation DEA/FBI badges, and credit cards in other people's names. Id. at 61, 64–65. While searching the car, the officers noticed that the dashboard and other interior panels appeared to be loose, as though the inside of the car had been taken apart. Id. at 65.

Later that same day, Officer Gruber and two other law enforcement agents went to the Embassy Suites on American Boulevard to continue their investigation of Anguiano's suspected drug trafficking. Id. at 128–31, 281. The front desk confirmed that Anguiano was registered to Room 714. Id. at 68, 129–30. The officers went to Room 714 and knocked on the door, which was opened by Defendant Zyaira Marie Gavino ("Gavino"). Id. at 69. The officers asked Gavino if they could speak with her, and she stepped back and motioned for the officers to enter the two-room suite. Id. at 70, 284–85.

Immediately inside the door to Room 714 was a living room area that included a pull-out couch. Id. at 71, 191, 304. A separate bedroom was down a small, open hallway. Id. at 71, 76. The door to the separate bedroom was open, and an armoire was visible through the doorway. Id. at 190. The doors of the armoire were locked together with a rigid chain lock. Id. at 76.

A man later identified as Baez was sitting on the couch in the living room. Id. at 71. A set of GM car keys was beside him on the couch. Id. at 78. A glass methamphetamine pipe with residue in plain view was on an end table next to Baez. Id. at 72–73, 286, 305. A backpack, suitcase, and other luggage were in the living room with Baez and Gavino. Id. at 72.

Baez and Gavino admitted to the officers that they had been smoking methamphetamine. Id. at 286–87. Gavino also told Officer Gruber that she and Baez were married and were visiting a friend at the hotel, and that they had been staying there with him for a few days. Id. at 75, 324; Gov't Ex. 5 at 3. Gavino stated that she knew the friend only by his nickname. Hr'g Tr. 75, 324. Officer Gruber then asked for Gavino's consent to conduct a search. Id. at 75. She agreed and pointed to a suitcase, backpack, and bags that she identified as hers. Id. at 75, 78, 287. Officer Gruber also requested and received Gavino's consent to search the room. Id. at 75. Baez made no statements regarding consent. Id. at 79.

Officer Gruber searched the backpack and found men's clothing and a small bag with four .22 caliber bullets. Id. at 78, 193. The backpack also contained an owner's manual for a Chevy Equinox that matched a set of GM keys Officer Gruber saw in plain view on the living room couch. Id. Upon finding the bullets, Officer Gruber informed Gavino and Baez that they were being detained for safety reasons due to the possibility that there may be a gun in the suite. Id. at 193–94. Gavino and Baez were then handcuffed. Id. at 193.

The law enforcement officers proceeded to search the entire suite. Id. at 76–79. In the back bedroom, the officers observed in plain view what appeared to be drug packaging material in an open-topped garbage can. Gov't Ex. 5 ("Search Warrant Aff.") at 3. In the far corner of the bedroom, the officers observed that a cell phone had been propped up to face the locked armoire. Hr'g Tr. at 77. The cell phone appeared to be monitoring the armoire by streaming a live video image from the phone camera to a Facebook Live website. Id. Officer Gruber asked Baez where narcotics might be if any were in the room, and he testified that Baez responded, "Well, in the armoire, obviously." Id. at 79. Based on this comment, Officer Gruber requested a K-9 officer to conduct a dog sniff of the room. Id. at 81. The drug dog alerted to the armoire and to an adjacent dresser. Id.

Officer Gruber "popped off" the front panel of a sink cabinet in the back bedroom and found a plastic bag that contained a pillowcase with two large bundles of what he believed to be multiple pounds of methamphetamine. Id. at 79. Upon finding the large quantity of suspected drugs, the officers decided to freeze the room and obtain a search warrant to search the rest of the room, including the armoire, and the Chevy Equinox. Id. at 80. Gavino and Baez were placed under arrest at this time and were transported to the Bloomington Police Department. Id. at 82–83.

After obtaining a warrant to search the hotel room, the officers opened the armoire and found additional methamphetamine and a handgun. Id. at 83–84. They also searched the Chevy Equinox and found methamphetamine, marijuana, and a gun. Id. at 84.[2]

---

[2] Baez correctly notes that the Order denying his Motion to Suppress mistakenly stated that Baez and Gavino were arrested after the armoire and Chevy Equinox were searched, rather than before. See Baez's Mot. Reconsider at 8 (citing Order at 9). This inaccuracy does not alter

The next afternoon, May 6, 2017, DEA Task Enforcement Officer Tom Maloney ("Officer Maloney") interviewed Gavino and Baez separately at the Bloomington Police Department. Id. at 204–05, 217, 220–21, 249. Officer Maloney had a preexisting federal investigation against Baez and Gavino that had been ongoing for the past few months. Id. at 261–62. At the beginning of his interview with Baez, Officer Maloney read him his Miranda rights and Baez stated that he understood them. Id. at 252, Gov't Ex. 6, Lines 56–61. Officer Maloney also informed Baez that he had been investigating him for several months. Gov't Ex. 6, Lines 130–32, 534–37.

On June 6, 2017, Anguiano, Baez, and Gavino were indicted for Conspiracy to Distribute Methamphetamine and Possession with Intent to Distribute Methamphetamine. Indictment [Docket No. 28].[3] All three Defendants filed motions to suppress evidence obtained in violation of the Fourth Amendment.[4]

Baez argued that his post-arrest statements must be excluded because: (1) they were the product of the illegal arrest of Anguiano and the illegal search of Anguiano's hotel room; and (2) the statements were not voluntary. See Baez's Mem. Supp. Mot. Suppress [Docket No. 117] at

---

the conclusions in the Order.

[3] A Superseding Indictment was filed against Baez on February 14, 2018. See Superseding Indictment [Docket No. 181].

[4] Gavino subsequently entered a plea of guilty to Using a Communication Facility to Commit a Drug Trafficking Felony and withdrew her motion to suppress. See Plea Hr'g Minutes [Docket No. 123]; Felony Information [Docket No. 121]. Anguiano entered a plea of guilty following this Court's denial of his Motion to Suppress. See Plea Agreement [Docket No. 172]. The Plea Agreement states that Anguiano reserves his right to appeal the denial of his Motion and to Suppress, and provides that Anguiano may withdraw his plea of guilty if he prevails upon appeal. Id.

9–16. Although Baez's Motion to Suppress included a sentence stating that his arrest "was unlawful and without probable cause," Mot. Suppress at 1, he did not provide an argument in support of this conclusory assertion in his supporting memorandum. See generally Baez Mem. Supp. Mot. Suppress.

On October 23, 2017, United States Magistrate Judge David T. Schultz issued a Report and Recommendation ("R&R") [Docket No. 138] concluding that the police officers lacked probable cause to arrest Anguiano and search his car without a warrant. The R&R thus recommended suppressing Anguiano's post-arrest statements and the evidence seized from his car. Additionally, Judge Schultz found that the officers lacked valid consent to search the back bedroom of the hotel suite and that the improper discovery of the methamphetamine in the sink cabinet supplied the probable cause for the later-obtained search warrant. He thus concluded that the searches of the armoire and Equinox were also improper. Judge Schultz further determined that the illegally obtained evidence resulted in Baez's arrest and his post-arrest statements. The R&R thus concluded that the evidence was fruit of the poisonous tree and must be suppressed from use against Anguiano and Baez.

The Government objected, arguing that Anguiano's arrest, the search of his vehicle, and the search of the hotel suite were all constitutionally valid. The Government further contended that even if Anguiano's Fourth Amendment rights were violated, the evidence need not be suppressed as to Baez because Baez lacked a privacy interest in the back bedroom of the hotel suite and thus his Fourth Amendment rights were not violated. In responding to the objection, Baez did not raise the issue of lack of probable cause to arrest him as an alternative ground for affirming the R&R's recommendation that Baez's statements be suppressed.

This Court overruled the Government's objection in part, finding that the arrest of Anguiano, the search of his vehicle, and the search of the sink cabinet in the back bedroom of the hotel suite violated Anguiano's Fourth Amendment rights. Therefore, some of the evidence found in the hotel suite was suppressed as to Anguiano. However, the Court sustained the Government's objection to the suppression of evidence against Baez. The Court found that Baez lacked a privacy interest in the back bedroom of the suite and thus his Fourth Amendment rights were not violated. The Court reasoned that the back portion of the hotel suite was being actively monitored through cell phone surveillance and thus Baez did not have a legitimate expectation of privacy in that room. The Court also analyzed Baez's post-arrest statements and concluded that they were voluntary. Therefore, Baez's Motion to Suppress was denied.

After the Court issued its Order on the Government's objections, Baez was appointed new counsel because of a breakdown in the attorney-client relationship between Baez and his former counsel. See Mot. Withdraw Counsel [Docket No. 161] at 1–4; Order Appointment Counsel [Docket No. 164].

On February 20, 2018, Baez's new attorney filed the Motion to Reconsider, requesting the Court reconsider its Order to address Baez's previously undeveloped argument that law enforcement lacked probable cause to arrest him. Baez argues that his mere presence in the hotel suite where methamphetamine was found did not give rise to probable cause to arrest him. He thus contends that his arrest is unlawful under the Fourth Amendment and that his post-arrest statements to law enforcement personnel must be suppressed as fruit of the poisonous tree.

## III.  DISCUSSION

### A.  Standard Governing Motions to Reconsider

The decision of whether to entertain a motion to reconsider a suppression ruling lies within the district court's discretion.  United States v. Laws, 819 F.3d 388, 396 (8th Cir. 2016) (citing United States v. Hayden, 759 F.3d 842, 845 (8th Cir. 2014)).  In deciding to whether to reconsider a suppression ruling, a court may consider the party's explanation as to why a particular argument could not have been raised earlier.  See United States v. Chavez Loya, 528 F.3d 546, 555 (8th Cir. 2008).

Baez argues that reconsideration is warranted because his failure to raise the probable cause argument was largely due to a breakdown in the attorney-client relationship with his former attorney.  Assuming without deciding whether this reason justifies reconsidering the Court's Order, the Motion to Reconsider is denied.  As explained below, ample probable cause existed for Baez's arrest.

### B.  Probable Cause for Arrest

Baez argues that his mere presence as an overnight guest in Anguiano's hotel room was not sufficient to warrant a particularized belief that Baez had committed a crime.  He contends that the observations by law enforcement at the time of his arrest suggested criminal activity only by others, not by Baez.  Baez thus argues that his warrantless arrest lacked probable cause and violated his Fourth Amendment rights.

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  To be constitutionally valid, a warrantless arrest must be based on probable

cause. Beck v. Ohio, 379 U.S. 89, 91 (1964). "Probable cause exists to make a warrantless arrest when, at the moment of the arrest, the collective knowledge of the officers involved was 'sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" United States v. Wajda, 810 F.2d 754, 758 (8th Cir. 1987) (quoting Beck, 379 U.S. at 91). A finding of probable cause does not require arresting officers to witness actual criminal activity or collect enough evidence to justify a conviction. United States v. Winarske, 715 F.3d 1063, 1067 (8th Cir. 2013). Rather, "the mere probability or substantial chance of criminal activity . . . is all that is required." Id. (internal quotations omitted).

The probable cause determination is a "practical, commonsense, and non-technical determination." United States v. Reiner Ramos, 818 F.2d 1392, 1394 (8th Cir. 1987) (internal quotations omitted). The facts must be analyzed for their cumulative effect in the totality of the circumstances, rather than in isolation. Id. "In making a probable cause determination, law enforcement officers have substantial latitude in interpreting and drawing inferences from factual circumstances." Winarske, 715 F.3d at 1067.

Courts consistently hold that when officers have knowledge of facts indicating the likelihood of drug dealing in a private and confined space such as a car or hotel room, and a small number of individuals are present in that space, it is reasonable for the officers to infer a common enterprise among the individuals because "drug dealing [is] an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him." Maryland v. Pringle, 540 U.S. 366, 373 (2003) (holding that probable cause existed to arrest all three occupants in a car containing hidden cocaine because it would have been reasonable to infer a common enterprise among the car's occupants); see also United States

v. Cowan, 674 F.3d 947, 954 (8th Cir. 2012) (holding that officers who had information that drug trafficking was occurring in an apartment had probable cause to believe that defendant was engaged in a common drug trafficking enterprise with the apartment's eight other occupants); United States v. Romero, 452 F.3d 610, 618 (6th Cir. 2006) ("It was reasonable for the officers to infer that [the defendant] was involved in the drug-dealing enterprise that was being conducted out of the hotel room, because drug dealing is 'an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.'") (quoting Pringle, 540 U.S. at 373); United States v. Kouayara, 189 F. Supp. 3d 835, 842–43 (D. Minn. 2016) (holding that a defendant's presence in a small cabin with four other individuals and over 460 pills "does not mean she is guilty of a crime, but it does mean that there was probable cause to suspect that she might be guilty of a crime," and noting that "officers could assume that the drug dealer or dealers would only permit individuals involved in the enterprise to be present in the cabin").

Under the totality of circumstances here, a reasonable person would believe that Baez had committed or was committing a drug trafficking offense. The officers' encounter with Anguiano and search of his vehicle equipped them with facts strongly suggesting that Anguiano was trafficking drugs. When they arrived at Anguiano's hotel room they found Baez and Gavino occupying Anguiano's room while he was gone. The officers learned from Gavino that she and her husband Baez had been staying with Anguiano for days in the small confines of the suite, yet they did not know his name, only his nickname. The suite contained open and obvious indications of illicit activity, including a methamphetamine pipe with residue, drug packaging material in the trash can, and a chain-locked armoire being monitored by a cell phone video feed,

all in plain view. Even without considering the methamphetamine hidden from view behind the sink cabinet panel,[5] it was reasonable for the officers to assume that Baez was involved in Anguiano's suspected drug trafficking enterprise. It was highly unlikely that Anguiano would have otherwise permitted Baez to be present in the small hotel suite.

In addition to the inference created by Baez's presence in the hotel room, the officers observed indications of criminal activity that were particular to Baez. The glass methamphetamine pipe with residue on a table next to Baez suggested a connection between Baez and the methamphetamine later found elsewhere in the room. The backpack where the bullets were found also contained men's clothing, which indicated that some of the items in the backpack, including the bullets, may have belonged to Baez, who was married to Gavino and had been staying with her in the front room. See also Tr. at 78 (testimony by Officer Gruber stating that he "searched a backpack that Gavino pointed out as their property") (emphasis added). It is common for drug dealers to use guns to protect their drugs and money. See, e.g., United States v. Parish, 606 F.3d 480, 490 (8th Cir. 2010) (citing cases). Additionally, Baez demonstrated his knowledge of the locked armoire and its contents when, in answer to the officers' question about where narcotics might be hidden, he responded, "Well, in the armoire, obviously." Tr. at 79.[6] A drug dog alerted to the armoire, corroborating Baez's statement that

---

[5] In ruling on Baez's motion to suppress the methamphetamine found under the sink panel, the Court held that the evidence is admissible as to Baez because he had no expectation of privacy in the back bedroom of the hotel suite. Order at 24. Whether or not that ruling is correct, there are sufficient facts to provide probable cause for the arrest of Baez.

[6] Baez argues that his answer to this question does not suggest that he had knowledge of the armoire's contents because anyone observing the room, even someone without knowledge of the armoire's contents, would have guessed that the visibly locked and monitored armoire contained what the officers were searching for. However, it was reasonable for the officers to

narcotics would be found there. Thus, the officers had probable cause to believe that Baez was engaged in drug trafficking.

To resist this conclusion, Baez argues that it was not reasonable for officers to infer that Baez had access to or control over drugs found hidden, locked, and monitored in the back bedroom, or that Baez was connected to possessing or distributing the contraband hidden there. In support, Baez cites to cases holding that where contraband is found in the trunk of a car, a passenger's mere presence in the vehicle does not constitute probable cause. See Baez Reply Mem. [Docket No. 198] at 2 (citing United States v. Munoz-Villalba, No. 1:05-248, 2005 WL 3050164, at *8 (M.D. Pa. Nov. 15, 2005); United States v. Mayberry, No. 12-153, 2013 WL 3560968, at *12 (D. Vt. July 11, 2013)). Those cases do not apply to the facts here. Although it is not reasonable to infer that a passenger who is merely present in a car has knowledge of or a connection to the contents in the car's trunk, it is reasonable to infer that a person staying for days in a hotel room with open and obvious signs of drug trafficking activity is involved in that activity. Therefore, probable cause existed for Baez's warrantless arrest, and his post-arrest statements are not fruit of the poisonous tree.

**C. Inevitable Discovery**

Even if the police lacked probable cause to arrest Baez before the search warrant was obtained, the officers would have had probable cause to arrest him after the warrant was

---

interpret Baez's statement as an admission of knowledge regarding the presence of drugs. The officers were not required to adopt the most innocent interpretation of Baez's answer. See Winarske, 715 F.3d at 1067 ("In making a probable cause determination, law enforcement officers have substantial latitude in interpreting and drawing inferences from factual circumstances.").

executed. Therefore, Baez still would have been in custody at the time he gave his statements to the police.

Under the inevitable discovery doctrine, if the prosecution can establish by a preponderance of the evidence that information otherwise subject to suppression under the exclusionary rule would have inevitably been discovered by lawful means, then the exclusionary rule does not apply. United States v. James, 353 F.3d 606, 616–17 (8th Cir. 2003). To demonstrate inevitable discovery, the prosecution must show that: "(1) there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." Id. at 617.

Here, the police had already decided to seek a search warrant at the time Baez was arrested. The warrant yielded additional evidence supporting probable cause to arrest Baez. Specifically, police found methamphetamine and a firearm in the Chevy Equinox. The keys to the Chevy Equinox were observed next to Baez on the couch. The owners manual for the car was found along with men's clothing in a backpack that was located in the front room where Baez and his wife, Gavino, were staying. These facts connect Baez to the Chevy Equinox and permit a reasonable inference that he had control over the car.[7] Police also found drugs in the armoire, where Baez suggested they would likely be. Therefore, probable cause would have

---

[7] Baez argues that the title documents in the car were tied to Anguiano's possession and that the Equinox manual and a traffic ticket tied the car to Gavino's control. The title documents and traffic ticket do not preclude a finding that Baez also had control over the car. Indeed, that items related to the Chevy Equinox were tied to more than one person suggests that multiple people exerted control over the car. Based on the proximity of the car keys to Baez, as well as the men's clothing found with the owner's manual in his wife's backpack, it is reasonable to infer that Baez was one of multiple people who had control over the car and its contents.

existed following the execution of the search warrant and Baez would have been in lawful custody at the time he made the statements he seeks to suppress.

**D.  Attenuation**

Even if Baez was arrested without probable cause, his statements are not subject to the exclusionary rule because the attenuation doctrine applies. Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." United States v. Yorgensen, 845 F.3d 908, 914 (8th Cir. 2017) (quoting Utah v. Strieff, 136 S. Ct. 2056, 2058 (2016)). To determine whether the causal connection between incriminating statements and an arrest that violated the Fourth Amendment has been broken, courts consider: "(1) whether the suspect has been advised of his Miranda rights prior to giving his statement; (2) the temporal proximity of his statements to his illegal seizure; (3) the existence of intervening causes between the illegal arrest and the statements; and (4) the purpose or flagrancy of the official misconduct." United States v. Reinholz, 245 F.3d 765, 779 (8th Cir. 2001). Here, all four factors weigh against excluding Baez's voluntary statement.

First, Baez received a Miranda warning advising him that he had a right not to speak to police and to have an attorney present. The giving of a Miranda warning is an "important, although not dispositive," factor that weighs against suppression of subsequent statements. Rollins v. Kentucky, 448 U.S. 98, 107 (1980).

Second, nearly 24 hours elapsed between Baez's arrest and when he made his statement to police. The time Baez spent overnight in jail gave him ample opportunity to reflect on his situation and consider whether to confess. See United States v. Hernandez-Hernandez, 384 F.3d

562, 565 (8th Cir. 2004) (considering whether the defendant had time "to contemplate his situation and reconsider his decision to confess"); Yorgensen, 845 F.3d at 914 (finding attenuation where defendant spent two days in custody between his arrest and his interview).

Third, intervening circumstances occurred between Baez's arrest and his statement because he was interviewed at a different location than his arrest and was questioned by different law enforcement personnel than those who were present when he was arrested. See Hernandez-Hernandez, 384 F.3d at 566–67 (holding that a change in location and different law enforcement agents were intervening circumstances). Additionally, Officer Maloney informed Baez that a separate federal investigation had been pending against Baez even before his arrest. See Yorgensen, 845 F.3d at 914–15 (finding intervening circumstances where defendant's statements were made to an agent whose pending drug trafficking investigation had identified the defendant as a person of interest). Based on these intervening circumstances, the May 6 interview was "a new and distinct experience" from the May 5 arrest. Hernandez-Hernandez, 384 F.3d at 566.

Finally, there is no evidence that the police engaged in purposeful or flagrant misconduct in arresting Baez. "Courts have found purposeful and flagrant police misconduct where: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up." United States v. Simpson, 439 F.3d 490, 496 (8th Cir. 2006). Neither situation applies here. In light of Pringle and its progeny, discussed above, it was not obvious that Baez's arrest was improper or likely unconstitutional. Nor was the arrest an investigatory tactic used in hopes of

eliciting a confession. To the contrary, the arrest was made after officers observed highly suspicious indicia of Baez's involvement in drug trafficking.

Because all four attenuation factors weigh against suppressing Baez's post-arrest statement, his Motion to Suppress would still be denied even if his arrest was invalid. Accordingly, Baez's Motion to Reconsider is denied.

## IV.  CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Kelvin Baez's Motion to Reconsider [Docket No. 189] is **DENIED**.

BY THE COURT:

    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  March 30, 2018.