UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,  CRIMINAL NO. 17-135 (ADM/DTS)

    Plaintiff,

v.  REPORT & RECOMMENDATION

2)    KELVIN BAEZ,
    *a/k/a Taliban*,

    Defendant.

---

David P. Steinkamp, Assistant U.S. Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota, 55415, for Plaintiff

R J Zayed, Esq., Dorsey & Whitney LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for Defendant Kelvin Baez

---

## INTRODUCTION

Defendant Kelvin Baez ("Baez") is charged with seven criminal counts, each stemming from the alleged possession and sale of methamphetamine or possession of a firearm in furtherance of the alleged drug trafficking crime. Many of Baez's pretrial motions have previously been addressed, but two remain outstanding. Baez seeks the suppression of statements he made to police during an interrogation following his arrest. He also argues that certain photographic identifications must be suppressed for being impermissibly suggestive. For reasons set forth below, the Court recommends that both motions be DENIED.

**FINDINGS OF FACT**

**I.     Police Interrogation[1]**

In connection with the arrest of Rodolfo Anguiano, Jr., police officers searched the hotel suite where he was staying. July 31, 2017 Hr'g Tr. 276, Docket Nos. 114-15. There, they met Baez and his wife, Zyaira Marie Gavino ("Gavino"). *Id.* at 69. During a search of the suite, the police found drugs and a handgun. *Id.* at 83-84. The police then arrested Baez and Gavino and took them to the Bloomington police station. August 13, 2018 Hr'g Tr. 38 (hereinafter "Hr'g Tr."), Docket No. 366; Gov't Ex. 1 (Medical Screen Admission Form).

At approximately 11 p.m. on the night of his arrest, Baez was booked, searched, and placed into a single-occupant holding cell with dimensions approximately 10 feet by seven feet. Hr'g Tr. 38, 40; Def.'s Ex. 4, at 2-5;[2] Def.'s Ex. 5. Baez asserts that he asked various officers what charges he faced, but that they did not answer him. Hr'g Tr. 38-39. Once he was in the cell, Baez states that he repeatedly attempted to talk to the guards by pressing a small button on his cell wall. *Id.* at 41-42. He asked various questions, including: "[W]hen am I [Baez] going to get my phone call? When can I call a bondsman? When can I call my attorney?" *Id.* at 42. Baez asserts that he asked for a phone call with his lawyer while he was in the holding cell. *Id.*

The following day, Detective Tom Maloney and Officer Flanagan interrogated Baez in a small interview room near his cell. Def.'s Ex. 7 (video of interrogation); Hr'g Tr. 40-41; Def.'s Ex. 5 (photographs of interview room #1). Baez asked about his wife,

---

[1]     Further details of Baez's arrest may be found in the prior R&R, Docket No. 371.

[2]     Defendant's Exhibit 4 is a series of separately paginated or unpaged documents form the Bloomington Police Department. Where helpful, the specific document is referenced in a parenthetical.

and Detective Maloney informed him they had interviewed her. Def.'s Ex. 6, at 1. Maloney told Baez that he wanted to talk about Baez's case. *Id.* at 2. When Baez indicated confusion about having a "case," Maloney clarified that he was referring to the ongoing investigation. *Id.* While stating that they did not want the encounter to be "confrontational," Maloney reminded Baez that he was in custody and had rights. *Id.* Maloney read Baez his *Miranda* rights; when asked if he understood his rights, Baez replied, "yeah." *Id.* When Maloney then asked if he would be willing to answer questions, Baez replied, "Yeah. [Unintelligible] you know what I'm saying. [Unintelligible]. You know what I mean?" *Id.*

Maloney and Flanagan interrogated Baez for approximately ninety minutes. Def.'s Ex. 7; Def.'s Ex. 6. During that time, both officers generally remained seated at the table. At several points throughout the interview, Maloney emphasized that he could not make promises to Baez regarding what charges he would face. Def.'s Ex. 6, at 15, 51-52, 55. A little over an hour into the interrogation, Maloney brought Baez something to drink. Def.'s Ex. 7, at 1:15:00. Baez answered each question with varying levels of detail until Maloney and Flanagan finished and Baez returned to his cell. Def.'s Ex. 6, at 55.

Baez alleges that, during the entire two-weeks prior to his arrest, he had been on a methamphetamine binge, had gotten little to no sleep, and "was in bad shape." Hr'g Tr. 37. He also claims that, due to the drugs and sleep deprivation, as well as symptoms of posttraumatic stress disorder,[3] he was unable to focus during the interrogation and did not understand his rights or many of the questions posed. *Id.* at 47.

---

[3] Baez was previously in a psychiatric ward for approximately two weeks due to complaints of flashbacks, at which point he was diagnosed with posttraumatic stress

3

## II. Photographic Identifications

On two separate occasions, individuals related to law enforcement's investigation of methamphetamine trafficking in Minneapolis positively identified Baez from a photograph. The first identification occurred in January 2018, when law enforcement spoke with a confidential source. *Id.* at 7. The source had previously told police that he or she knew an individual who went by the alias "Taliban," and had at least six interactions with that person. *Id.* The source gave the police a phone number associated with Taliban, which officers checked against phone numbers associated with other investigations throughout the country. *Id.* at 8-9. A DEA agent in Miami recognized the number and provided the Minnesota law enforcement with a photograph of Baez, who was associated with number. *Id.* at 9-10; Gov't Ex. 5. Officers showed the single photograph to the confidential source and asked whether the source recognized the person pictured. *Id.* at 11-12. The source replied that the person in the picture was "Taliban." *Id.* at 12.

The second photographic identification was made by a cooperating defendant ("CD") in April 2018. *Id.* During a proffer meeting, officers showed the CD a three-ring binder containing approximately 92 photographs. *Id.* at 12-13; Gov't Ex. 3. They told the CD that he may or may not recognize individuals in the book, but asked the CD to go through the book and tell the officers if he or she knew anybody. Hr'g Tr. 13. The CD stated that he or she recognized the person pictured in photograph 64, which was a picture of Baez. *Id.*; Gov't Ex. 5. The CD knew the person as "Taliban" or "Cubano." Hr'g Tr. 13.

---

disorder. Hr'g Tr. 35. Veterans Affairs considers Baez currently to have a 60% disability rating, 50% of which it attributes to posttraumatic stress disorder. Def.s' Ex. 1 (May 1, 2018 benefits decision letter).

4

**CONCLUSIONS OF LAW**

I.   **Suppression of Statements**

To safeguard the right against self-incrimination, police conducting a custodial interrogation must advise the suspect of those rights. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). The Government bears the burden of demonstrating by a preponderance of the evidence that any subsequent waiver of those rights was made knowingly and intelligently, as well as voluntarily. *Id.* at 475-76.

There is no dispute that Baez was in custody, that police read Baez his *Miranda* rights, or that they then proceeded to interrogate him. However, Baez argues that his statements to the police during his post-arrest interrogation must be suppressed because (1) his waiver of his rights was not knowing, intelligent and voluntary; and (2) he had invoked his Fifth Amendment right to counsel and had not reinitiated the conversation with police. None of these arguments is availing.

   A.   **Knowing, Intelligent, and Voluntary Waiver**

In assessing whether Baez knowingly and intelligently waived his rights when questioned by the police, the Court must examine the totality of the circumstances to determine whether the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Bell v. Norris*, 586 F.3d 624, 630 (8th Cir. 2009) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Similarly, Baez's waiver was voluntary if, given the totality of the circumstances, it was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008). This evaluation may include sleeplessness, intoxication and mental illness. *Id.*; *see also United States*

5

*v. Turner*, 157 F.3d 552, 555-56 (8th Cir. 1998) (declining to adopt a "per se" rule regarding waivers while intoxicated).

The record indicates Baez understood his rights and what he was giving up by speaking to the police, even if he was sleep deprived or experiencing symptoms of PTSD. After reading Baez his Miranda rights, Detective Maloney asked Baez if he understood his rights, to which he replied, "[y]eah." Def.'s Ex. 6, at 2. Throughout the interrogation, Baez suggested to the police that he would tell them what they want to know and that he could get information that the police couldn't. *See id.* at 5, 11. He also inquired what was "in it for [him]" if he provided the police useful information, as he was aware he was facing an imminent charge. *Id.* at 12-13. This attempted bargaining clearly reflects an individual who was aware of strategic choices he was making by talking to the police. *Cf. Turner*, 157 F.3d at 555 (considering as evidence of a knowing and intelligent waiver the fact that the defendant "acted in a manner more consistent with a person attempting to avoid being caught than a person who did not know what he was doing").

Further, there is nothing to suggest Baez's waiver was involuntary. A review of the video of the interrogation shows both officers acting with Baez in the interrogation room in a non-threatening manner and bringing him something to drink when he asked for it. Def.'s Ex. 7. The interrogation was not drawn out with no breaks with the intention of wearing Baez down. *See United States v. Daniels*, 775 F.3d 1001, 1004-05 (8th Cir. 2014) ("We consider, among other things, the degree of police coercion, the length of interrogation . . . [and] its continuity . . . ." Detective Maloney explicitly clarified what he meant by "case" when Baez mistakenly believed it meant he had already been charged. Def.'s Ex. 6, at 2.

Even if Baez's testimony that he had not gotten meaningful sleep for two weeks because he was smoking methamphetamine is credible, "intoxication and fatigue do not automatically render a confession involuntary." *Gaddy*, 532 F.3d at 788. Rather, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). While Baez informed the police he had PTSD when he was booked, Gov't Ex. 1, the officers interrogating him had no clear means of knowing that he was possibly experiencing symptoms during the interview, or that he was otherwise extremely sleep deprived or still under the influence of drugs. *See Daniels*, 775 F.3d at 1005 (finding "no outward manifestations that would suggest [defendant's] *Miranda* waiver or subsequent admissions were involuntary"). Although Baez stated at the beginning of the interview that he was tired, he clearly appeared to follow the questioning, even asking his own questions in return as he attempted to gauge how much the police already knew.

Based upon the totality of the circumstances, the Court is satisfied that Baez acted knowingly and intelligently when he waived his *Miranda* rights and talked to the police. Further, there is no indication that his waiver was made involuntary by the conduct of the police, either through direct coercion or by taking advantage of his weakened mental state.

### B.   Pre-*Miranda* Invocation of Right to Counsel

Baez also suggests that, even if his waiver was valid, the interrogation must be suppressed because he had already invoked his right to counsel the night before. Once a suspect has asserted his right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."

7

*Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). However, assuming without deciding that Baez did unambiguously state that he wanted to speak to his attorney at some point during the night while in custody, his invocation was premature and thus ineffective.

The *Miranda* safeguards attach "not where a suspect is taken into custody, but rather where a suspect in custody is subjected to interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). The Supreme Court has "never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation.'" *Bobby v. Dixon*, 565 U.S. 23, 28 (2011) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 182, n. 3 (1991)) (declining to recognize a right to counsel during a non-custodial interrogation).

While the Eighth Circuit has never directly addressed the question of anticipatory invocation, those circuits that have done so have declined to recognize invocation of the right to counsel unless the custodial interrogation is occurring or is at least "imminent," and have generally based this conclusion on the Supreme Court's dicta in *McNeil*. *See, e.g.*, *United States v. Cash*, 733 F.3d 1264, 1276-77 (10th Cir. 2013) ("*Miranda* is therefore only applicable when (1) the suspect is in 'custody,' and (2) any questioning meets the legal definition of interrogation.") (internal quotations omitted); *United States v. Rambo*, 365 F.3d 906, 909 (10th Cir. 2004) (holding that "custodial interrogation must be imminent or presently occurring"); *United States v. Muick*, 167 F.3d 1162, 1166 (7th Cir. 1999) (holding that, for a defendant to invoke *Miranda*, "authorities must be conducting interrogation, or interrogation must be imminent"); *United States v. Wright*, 962 F.2d 953, 955 (9th Cir. 1992) ("The Court has never held that *Miranda* rights may be invoked anticipatorily outside the context of custodial interrogation; we see no reason, apart from those already rejected in *McNeil*, to do so here."). The Third Circuit

8

has gone even further, declining to adopt "a rule allowing a suspect to invoke the right to counsel in cases where the suspect is in custody, has already been interrogated, and may be reinterrogated at some point in the future." *Alston v. Redman*, 34 F.3d 1237, 1245 (3d Cir. 1994). Without binding precedent to guide it, and finding no directly contrary federal precedent, this Court follows the weight of persuasive authority.

Here, Baez, taken at his word, asked to call a lawyer after he was booked, but hours before Detective Maloney and Officer Flanagan arrived to interrogate him. This cannot be reasonably construed as "imminent" to the interrogation. *C.f. United States v. Hinkson*, CR-04-127-S-RCT, 2004 WL 7333646, at *8 (D. Idaho, Dec. 22, 2004) (finding that a custodial interrogation was imminent to the invocation when "within a span of less than five minutes," defendant was told an FBI agent was going to speak to him, the FBI agent placed him under arrest, and the defendant then asked to call his lawyer). Further, the timing of Baez's request for an attorney suggests, not an attempt to invoke his Fifth Amendment right, but rather his Sixth Amendment right to counsel. *See United States v. Doe*, 170 F.3d 1162, 166 (9th Cir. 1999) ("A statement concerning an attorney made before interrogation begins is far less likely to be a request for attorney assistance during interrogation than a similar statement made during custodial interrogation."); *McNeil*, 501 U.S. at 178 (noting that a suspect must request "the particular sort of lawyerly assistance that is the subject of *Miranda*"). Baez's testimony also suggests this is what he had in mind, as he noted he wanted to know what he was being charged with and when he was going to "get [his] phone call . . . call a bondsman . . . call [his] attorney?." Hr'g Tr. 42. Any request for an attorney Baez alleges he made cannot be deemed a timely invocation of his Fifth Amendment right to have an attorney present, and thus the police did not violate his rights.

## II.  Suppression of Photographic Identifications

Baez also moves to suppress two photographic identifications of him. Neither photographic identification was so impermissibly suggestive as to warrant suppression. Photographic identifications made pre-trial are inadmissible if the "procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). In the Eighth Circuit, courts first determine whether the photographic presentation was impermissibly suggestive and, if so, whether, based upon the totality of the circumstances, the suggestiveness undermined the reliability of the identification and created a substantial likelihood of irreparable misidentification. *United States v. Martin*, 391 F.3d 949, 952 (8th Cir. 2004). If a court determines that the independent reliability of the identification outweighs its suggestive nature, it need not suppress. *Manson v. Brathwaite*, 432 U.S. 98, 115 (1977).

As to the photographic identification by the confidential source, Baez argues that the use of the single photograph was impermissibly suggestive and that the Government has not sufficiently demonstrated the independent reliability of the identification. This is incorrect. While the Eighth Circuit has held single photo identifications to be impermissibly suggestive, *see United States v. Patterson*, 20 F.3d 801, 806 (8th Cir. 1994), it has clarified a distinction where the witness is previously acquainted with the defendant. *United States v. Dobbs*, 449 F.3d 904, 909-10 (8th Cir. 2006). Unlike situations where the eyewitness is not previously familiar with the defendant, single photograph identifications by someone who already knows the

10

defendant do not raise the same concerns of undue prejudice.[4] *Id.* Here, the single photographic identification was not impermissibly suggestive. Prior to seeing the picture, the confidential source stated that he or she had personally met with Baez, known as Taliban, at least six times and was able to provide a phone number for that individual, which reasonably led law enforcement to conclude that the confidential source was acquainted with Baez. The single photograph they showed to the confidential source simply confirmed for the officers that "Taliban" was Baez.

Similarly, there was nothing impermissibly suggestive about the photographic array shown to the cooperating defendant. Due process is not offended when police, as they did here, show a witness a series of photographs and ask non-leading questions while never implying that the defendant is one of the individuals in the array. *See United States v. Omar*, 786 F.3d 1104, 1108-09 (8th Cir. 2015). From approximately 92 photographs, the cooperating defendant identified Baez's photograph and stated that he worked for Anguiano, another suspect in the investigation. While the police did not dive deeply into the cooperating defendant's relationship with Baez, such details are unnecessary when the photographic array itself is not impermissibly suggestive. *See United States v. Triplett*, 104 F.3d 1074, 1079-80 (8th Cir. 1997) ("Because [defendant] has failed to make a threshold demonstration that the line-up procedure was impermissibly suggestive, we need go no further in our inquiry.").

---

[4] The language of the five factors for reliability that the Supreme Court listed in *Neil v. Biggers*, 409 U.S. 188 (1972), and which both parties cite, reinforces the logic of this distinction. Each factor in *Biggers* clearly implies the context of an eyewitness to a crime as it occurred. *Id.* at 199-200 (stating that courts should consider (1) the witness's opportunity to view the defendant, (2) the witness's degree of attention, (3) the accuracy of any prior description given by the witness, (4) the witness's degree of certainty in his or her identification, and (5) the length of time between the crime and the confrontation).

Because neither of the photographic identifications was impermissibly suggestive, suppression is not warranted.

## RECOMMENDATION

IT IS HEREBY RECOMMENDED that:

1. Defendant Kelvin Baez's Motion to Suppress Statements [Docket No. 291] be DENIED.

2. Defendant Kelvin Baez's Motion to Suppress Eyewitness Identifications [Docket No. 360] be DENIED.

Dated:      September 13, 2018

*s/ David T. Schultz*
DAVID T. SCHULTZ
United States Magistrate Judge